**In re NASDAQ MARKET–MAKERS ANTITRUST LITIGATION.**

No. 94 Civ. 3996 (RWS).

United States District Court, S.D. New York.

Aug. 4, 1995.

Fine Kaplan and Black, Philadelphia, PA (Arthur M. Kaplan, of counsel), Milberg Weiss Bershad Hynes & Lerach, San Diego, CA (Leonard B. Simon, of counsel), Christopher Lovell, P.C., New York City (Christopher Lovell, of counsel), Wechsler Skirnick Harwood Halebian & Feffer, New York City (Robert A. Skirnick, of counsel), Pomerantz Levy Hauder Block & Grossman, New York City (Stanley M. Grossman, Shaheen Rushd, of counsel), Garwin, Bronzaft, Gerstein & Fisher, New York City (Bruce E. Gerstein, Jerald M. Stein, of counsel), for plaintiff.

Sullivan & Cromwell, New York City (John L. Warden, Michael Lacovara, Nicole A. LaBarbera, Tracey J. Bolotnick, of counsel), for defendant Goldman, Sachs & Co.

Shearman & Sterling, New York City (Joseph T. McLaughlin, James T. Halverson, of counsel), for defendant Herzog, Heine, Geduld, Inc.

*OPINION*

SWEET, District Judge.

The Defendants in this multidistrict litigation have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure alleging that the complaint fails to allege with sufficient specificity a claim upon which relief can be granted. For the reasons discussed below, the motion is granted with leave for plaintiffs to amend the complaint.

### Parties

The 33 named Defendants in this action are all market-makers on the Nasdaq exchange.[1] The complaint describes them as "leading Nasdaq market-makers." Nasdaq is a computerized quotations system operated by the National Association of Securities Dealers ("NASD"). In 1993, Nasdaq trading volume totaled more than 66.5 billion shares, with an average of 263 million shares traded each trading day. For that year, more than $1.35 trillion dollars in trades were executed through Nasdaq. *1994 Nasdaq Fact Book and Company Directory* ("*Fact Book*"). In 1993, there were 492 Nasdaq market-makers, making markets in 5,393 stocks, of which approximately 3,250 are listed and traded on the Nasdaq National Market, and the remainder on the Nasdaq Small Cap Market. On average there are 11 market-makers for a Nasdaq stock; there are some stocks with more than 40.

Plaintiffs include the State of Louisiana, through its Attorney General, Richard P. Ieyoub, that brings this action in its capacity

---

1. The named defendants include: Goldman Sachs & Co.; Herzog, Heine, Geduld, Inc.; Alex. Brown & Sons, Inc.; Cantor Fitzgerald & Co.; CS First Boston Corp.; Donaldson, Lufkin & Jenrette, Inc.; Bear, Stearns, Inc.; Cowen & Co.; Dean Witter Reynolds Inc.; Hambrecht & Quist, Inc.; Jeffries and Co., Inc.; Kidder, Peabody & Co. Incorporated; Lehman Brothers, Inc.; Kemper Securities Group, Inc.; Legg Mason Wood Walker, Inc.; Mayer & Schweitzer, Inc., Merrill Lynch & Co.; Morgan Stanley & Co.; Olde Discount Corporation; PaineWebber Inc.; Montgomery Securities; Nash, Weiss & Co.; Oppenheimer & Co., Inc.; Piper Jaffray & Hopwood, Inc.; Prudential Securities Incorporated; The Robinson–Humphrey Company, Inc.; Sherwood Securities Corp.; Troster Singer; Robertson, Stephens & Company; Salomon Brothers Inc.; Smith Barney Inc.; UBS Securities Inc.; Weeden & Co., L.P.

as *parens patriae*, trustee, guardian, and representative of Louisiana investors allegedly damaged by the price-fixing scheme alleged and 30 individual plaintiffs[2] who "purchased or sold shares of Class Securities from one or more defendants or their commonly owned affiliates during the period of May 1, 1989 to May 24, 1994.

### Prior Proceedings

The first class action complaint in what has become a multidistrict case was filed on May 27, 1994 following reports in the media on May 26 and 27, 1994 of a study by Professors William G. Christie and Paul H. Schultz[3] discussing the spreads on the Nasdaq exchange. Eventually more than two dozen complaints were filed around the country, alleging variations on the theme that the Nasdaq Market-makers had engaged in a conspiracy to avoid odd-eighth quotes in violation of the Sherman Act, 15 U.S.C. § 1. Approximately two dozen of the thirty-three moving defendants were defendants in at least one of these initial complaints.

Certain parties named in the initial complaints petitioned the Judicial Panel on Multidistrict Litigation (the "Panel") for consolidation of all related actions before this Court. On October 14, 1994, the Panel ordered that the already filed, as well as later-filed actions, be assigned to this Court.

A pretrial order was signed on November 16, 1994 which named plaintiffs' Co–Lead Counsel and directed defendants to chose liaison counsel, which they did and the court confirmed their choice on December 21, 1994.

A "Consolidated Amended Complaint" (the "Complaint") was filed on December 16, 1994. It is that Complaint which is the subject of this motion to dismiss.

This motion to dismiss was filed on February 2, 1995 and argument was scheduled for April 26, 1995. Argument was heard on April 25 and the motion was considered fully submitted at that time.

As of April 25, 1995, more than 30 actions had been consolidated in this Court as MDL 1023—*In re NASDAQ Market–Makers Litigation.*

### Other Proceedings

In October 1994, the Antitrust Division of the Department of Justice ("DOJ") announced that it was commencing a broad review of a number of aspects of Nasdaq's market structure.

On November 14, 1994, the Securities and Exchange Commission (the "SEC") announced that it was undertaking a review of the operation of Nasdaq, including the "spreads" issue alleged in the Complaint, and broader issues concerning the structure of the market itself.

In addition, on November 20, 1994, the NASD announced the formation of a seven-member panel to undertake a "plenary review [o]f the effectiveness of the operation and surveillance" of the NASD.

### The Complaint

The Complaint describes the 33 named defendants as "leading market-makers" in the Nasdaq market who are "in continuous

---

**2.** Individual named plaintiffs include: Donald Bleznak c/f Andrew Bleznak, a resident of New Jersey; Richard I. Burstein, a resident of Vermont; Chevra Gemilath Chasodam, a charitable organization located in New York; Carl S. Clark and Patricia Clark, residents of Michigan; Daniel D'Addario, a resident of New York; Roseann D'Addario, a resident of New York; Maxine Dampf, a resident of New York; Jerome D. Derdel, M.D., a resident of Pennsylvania; Sulochana Desai, a resident of Michigan; H. Leslie Fineberg, a resident of New Jersey; Nicholas Frangiosa, a resident of Pennsylvania; Neal Hansen and Donna Hansen, residents of New Jersey; Timothy Hennessey, a resident of Oregon; Brent Johnson, a resident of Minnesota; Charles Kaye, a resident of Michigan; James Krum, a resident of Minnesota; Robert Lipinski, a resident of New Jersey; Dr. John Lorge, a resident of the State of

Washington; William Lutz, Jr., a resident of Pennsylvania; Dennis Maloney, a resident of New York; Kevin Maloney, a resident of New York; Richard I. Perlman, a resident of California; Jeffrey Sachs, a resident of California; David Siegel, a resident of California; Two Guys Limited Partnership and their General Partner, Geltmore, Inc., having their principal place of business in New Mexico; Peter Wasserman, a resident of the State of New Hampshire; Dennis Weiner, a resident of New Jersey; and Sumner Woodrow, a resident of Massachusetts.

**3.** The article, entitled "Why do NASDAQ Market Makers Avoid Odd–Eighth Quotes?," was published in *The Journal of Finance* in December, 1994.

communication with one another by computer and telephone," and alleges that:

> Beginning as early as 1989, defendants and their co-conspirators combined and conspired to raise, fix and maintain, and did raise, fix and maintain at supra-competitive levels the "spread" [4] paid by plaintiffs and Class members to trade in certain Nasdaq securities ("Class Securities" [5] ...). Complaint ¶ 101.
>
> In furtherance of their combination and conspiracy, defendants and their co-conspirators raised, fixed and maintained Nasdaq spreads through the following means, among others: following the spread set by the dominant dealer (known as "the name") in a particular security; agreeing not to compete by offering a lower spread; threatening and pressuring any trader who attempts to compete by "breaking the spread"; trading around the trader who breaks a spread; or refusing to conduct business in other contexts with firms that break the spread. Complaint, ¶ 108.

The Complaint further alleges that the spread is a major source of market-maker profits and that:

> [t]he large number of market makers competing for business on actively traded Nasdaq Class securities, and Nasdaq's high degree of automation, should result in a narrower spread than those on the exchanges. However, it has not. To the contrary, spreads on Nasdaq Class securities have been, on average, approximately twice as large as spreads for comparable securities traded on the stock exchanges. Complaint ¶ 102.
>
> (a) In a competitive market for most actively traded stocks (except for the very lowest and very highest priced stocks), the spread in the stock will typically be one eighth. (As an example, the bid will be 20⅛ and the ask will be 20¼.)
>
> (b) On the stock exchanges, including the New York and the American stock exchanges, spreads of one eighth are typical for most actively traded stocks.
>
> (c) Absent defendants' combination and conspiracy, the frequency of one-eighth spreads on Class Securities would have been at least as great as the frequency of one-eighth spreads for comparable securities sold on the stock exchanges. Complaint ¶ 104.

Defendants and their co-conspirators raised, fixed and maintained the spreads for Class Securities on Nasdaq to supra-competitive levels through, among others, the mechanism of collectively refusing to quote their bids and asks for Class Securities in so-called odd-eighths ...; instead, widening spreads to even-eighths.

Accordingly, $.25 per share became the minimum spread for Class Securities, whereas the typical spread for actively traded Class Securities otherwise would have been half that amount. Complaint ¶ 105.

... enforcement for the combination and conspiracy has included telephone calls from purportedly competing market-makers in which the market-maker who has broken the conspiratorial spread is accused of "Chinese trading" (a pejorative term of art among defendants and their co-conspirators), or telephone calls communicating other conspiratorial reminders, warnings or verbal abuse. Complaint ¶ 106.

Examples from the public record of such conspiratorial reminders, warnings and verbal abuse, include:

> (a) Novice traders learn quickly that if they want to keep their jobs on an o-t-c desk, they will do well not to beat the price of fellow market-makers. "Breaking the spread," as it is called, just isn't done. One veteran, who tried on one occasion to narrow an o-t-c spread, told FORBES: "I used to get phone calls from people; they'd scream, 'Don't

---

**4.** The Complaint defines the spread as the difference between the "bid" (the price at which the market-maker is willing to buy a security) and the "ask" (the price at which the market-maker is willing to sell such a security).

**5.** The Complaint defines "class security" as "any and all stocks traded on the Nasdaq National Market for which odd-eighth quotations were effectively eliminated for a period of at least on continuous, full year ... [between May 1, 1989 and May 27, 1994]."

break the spread! You're ruining it for everybody else!' "

Another trader who tried something similar said: "My phone lights up like a Christmas tree. 'Whaddya doing in the stock? You're closing the spread. We don't play ball that way. Go back where you belong' ".

\* \* \* \* \* \*

Veterans well know that closing the spread might gain them an order, but in the end it would spoil the game.

Forbes, August 16, 1993, "Fun and Games on Nasdaq."

(b) After Domestic Securities Inc. broke the spread on Intel Corp. on a trading day in late summer 1994, defendant Weeden & Co. flashed a message of "pathetic" on the trading terminal of Domestic Securities Inc.; and defendant Morgan Stanley & Co. called immediately and complained "did you guys break the spread for 1,000 shares?" *Los Angeles Times,* October 20, 1994, "Taking Stock on Nasdaq."

(c) After Domestic Securities Inc. broke the spread for Chiron Corp. stock, Keith Balter, the head of over the counter trading for defendant Weeden & Co., immediately telephoned Domestic Securities Inc. and stated "you're embarrassing and pathetic . . . you're breaking the spreads for everybody." *Id.*

(d) On July 15, 1994, Domestic Securities Inc. broke the spread in Xilinx Corp. stock and, in response, defendant Hambrecht & Quist called Domestic and stated "This is bull ____. I have institutional customers come to me and I have to meet your price. It's bull ____, you guys going down ⅛ for 1,000 shares." *Id.* Complaint ¶ 107.

As a result of . . . [the] conspiracy, and enforcement activities, Nasdaq spreads have been raised fixed and maintained at a level on average twice as large as the spreads on the New York and American stock exchanges for securities of comparable characteristics. . . . from May 1, 1989 to May, 1993, average spreads on the Nasdaq National Market increased by over 37%, during which time average spreads on the New York and the American stock exchanges have held steady. A study concluded that spreads were reduced by more than 50% on average when securities moved from trading on Nasdaq to trading on an exchange. Complaint ¶ 109.

. . . defendants and their co-conspirators quoted bids and asks for Class securities in a manner that reflects a statistically unexplainable, almost complete absence of bids or asks in odd-eighths. In freely traded securities odd-eighth quote bids or asks occur frequently and would be expected to occur almost as often as even-eighth bids or asks. Complaint ¶ 110.

. . . defendants suddenly began to use odd-eighths quotes and reduced the spreads for selected high-profile Class Securities shortly after (a) widespread news reports in late May 1994 about a study by Professor William G. Christies and Professor Paul H. Schultz indicating collusion in fixing of Nasdaq spreads; and again (b) in October 1994, after the United States Department of Justice publicly announced an investigation into whether defendants had conspired to fix Nasdaq spreads. For example, after the news reports in late May 1994, defendant Alex. Brown & Sons cut the spread for Apple Computer, and other defendants followed; and defendant Goldman Sachs & Co. cut the spread for Microsoft Corporation, and other defendants followed. Defendants cut the spreads on theses and certain other high-profile Nasdaq securities by approximately 50% following publicity about defendants' price fixing and a meeting in late May, 1994 attended by various defendants at the headquarters of defendant Bear, Stearns & Co. Complaint ¶ 11.

On information and belief, each defendant's costs and risks of doing business as a market-maker did not diminish as the time of the news reports about price fixing in late May, 1994; nor at the time of the news reports about the Department of Justice investigation in October 1994. . . . Complaint ¶ 112.

The Complaint further alleges that the acts were "covert, secret and undisclosed,"

and were not permitted by any act of Congress nor any rule of the SEC or the NASD.

### Discussion

### The Motion Will be Treated as a Motion to Dismiss

■ The Court of Appeals has made clear that where a District Court is provided with materials outside the pleadings in the context of a 12(b)(6) motion to dismiss, it has two options:

> the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one from summary judgment under Fed. R.Civ.P. 56 and afford all parties the opportunity to present supporting material. *See* Fed.R.Civ.P. 12(b).

*Kopec v. Coughlin,* 922 F.2d 152, 154 (2d Cir.1991) (*quoting Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988).

Although both sides have submitted substantial documentation in support of their positions, the Court will disregard this material and, as the parties urged at oral argument, and in their papers, treat this as a 12(b)(6) motion.

### Standards for Reviewing a 12(b)(6) Motion

■ On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. See *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken from Plaintiffs' Amended Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motions.

■ Rule 12(b)(6) also imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). *Accord Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984) (quoted in *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 250–51, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989)).

■ "In practice 'a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under *some* viable legal theory.' " *Fort Wayne Telsat v. Entertainment & Sports Prog. Network,* 753 F.Supp. 109, 111 (S.D.N.Y.1990), *quoting, Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

Rule 8(a)(2) of the Federal Rules of Civil Procedure mandates that a complaint contain a "short and plain statement of the claim" that demonstrates "that the pleader is entitled to relief." The Federal Rules do "not permit conclusory statements to substitute for minimally sufficient factual allegations." *Furlong v. Long Island College Hosp.,* 710 F.2d 922, 927 (2d Cir.1983).

■ As both parties agree, the burden on a plaintiff alleging federal antitrust violations is no greater than the burden faced by a plaintiff alleging any cause of action not covered by the specific pleading requirements of Rule 9 of the Federal Rules of Civil Procedure. *See George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., Inc.,* 554 F.2d 551, 554 (2d Cir.1977) ("It ... [is] clear in this circuit ... that a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules," *citing Nagler v. Admiral Corp.,* 248 F.2d 319 (2d Cir.1957)); *Nagler,* 248 F.2d at 322–23 ( [it is] "quite clear that the federal rules contain no special exceptions for antitrust cases"); *Barr v. Dramatists Guild, Inc.,* 573 F.Supp. 555, 558 (S.D.N.Y.1983) (citing *George C. Frey* for the proposition that there are no special pleading standards for antitrust conspiracy); *Newburger v. Gross,* 365 F.Supp. 1364, 1367–68 (S.D.N.Y.1973) (citing *Nagler* for the proposition that there are no special

pleading requirements in antitrust litigation), *modified on other grounds,* 563 F.2d 1057 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp.,* 711 F.2d 989, 995 (11th Cir.1983) ("It is now well accepted that notice pleading is all that is required for a valid antitrust complaint").

While in the context of large antitrust action, *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 903 n. 17, 74 L.Ed.2d 723 (1983) the Supreme Court noted that "[c]ertainly in a case of this magnitude, a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to procede[,]" recently in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* —— U.S. ——, ——, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993), the Court affirmed that the liberal system of notice pleading applies to all causes of action unless otherwise specified in the Rules. As both sides concede, there are no specific rules regarding antitrust pleading requirements.

### The Motion to Dismiss the Complaint is Granted with Leave to Replead

Section One of the Sherman Act reads, in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony....

15 U.S.C. § 1 (1973)

■ To withstand a motion to dismiss, the plaintiff in a Sherman Antitrust Conspiracy claim must allege (1) concerted action; (2) by two or more persons; (3) that unreasonably restrains interstate or foreign trade or commerce. *Three Crown Limited Partnership v. Caxton Corporation,* 817 F.Supp. 1033, 1047 (S.D.N.Y.1993); *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Ser-*

*vices,* 746 F.Supp. 320, 325 (S.D.N.Y.1990); *Accord International Distribution Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 793 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

Defendants do not argue that these are not the elements, rather they argue that the elements have not been sufficiently alleged. Specifically, they contend:

(i) the Complaint fails to allege any relevant fact that demonstrates joint action among *any* of the thirty-three defendants;

(ii) the Complaint affords defendants no notice regarding the identity (or even the number) of the "Class Securities," that will be the subject of this action; and

(iii) The complaint rests virtually in its entirety on theoretical economic propositions, none of which is supported by allegations of fact, but which are instead entirely beholden to a limited, flawed academic article.

### A. The Complaint Fails to Provide the Defendants with Sufficient Notice of the Identity of the Class Securities

Plaintiffs define the relevant product market as "any and all stocks traded on the Nasdaq National Market for which odd-eighth quotations were effectively eliminated for a period of at least on continuous, full year ... [between May 1, 1989 and May 27, 1994]." While a complaint that specifically defines the alleged relevant product market need not prove on the face of the complaint that the market is the proper one, *see Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965), plaintiffs have not sufficiently alleged a specific market such that the Complaint can withstand this motion to dismiss. *See, e.g. North Jersey Secretarial School v. McKiernan,* 713 F.Supp. 577 (S.D.N.Y.1989).

■ To survive a motion to dismiss, a complaint alleging a conspiracy in violation of the Sherman Act must "identify the relevant product market ... co-conspirators, and describe the nature and effects of the alleged conspiracy." *International Television Prods. Ltd. v. Twentieth Century–Fox Tele-*

*vision Div. of Twentieth Century–Fox Film Corp.*, 622 F.Supp. 1532, 1537 (S.D.N.Y.1985). In *International Television Prods.* the complaint named the two parties to an agreement and specified the content of the agreement. Because the parties were named, there could be no question that there was sufficient notice as to the identity of the co-conspirators.

■ While *North Jersey*, and the cases it cites at 713 F.Supp. at 583, and *International Television Prods.* stand for the proposition that markets defined geographically must be specified such that the anticompetitive effect may be assessed, the problem with the lack of specificity in this Complaint has more to do with notice. Additional specificity in this sort of massive action is required in order to provide notice to the potential defendants. A requirement of such specificity is appropriate in this case given its magnitude. *See Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 903 n. 17, 74 L.Ed.2d 723 (1983) (the Supreme Court noted that "[c]ertainly in a case of this magnitude, a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to procede[,].")

Sufficient notice has not been given to potential defendants in this action as to the securities alleged to be the subject of the conspiracy. While some defendants are named in the Complaint others are described simply as major-market makers that traded Class Securities. The Class Securities are defined as "any and all stocks traded on the Nasdaq National Market for which odd-eighth quotations were effectively eliminated for a period of at least on continuous, full year within the period of May 1, 1989 to May 27, 1994." ¶¶ 81 and 82, Complaint.

Given the massive nature of the conspiracy alleged, it is reasonable to require the plaintiffs to identify the subject stocks so that adequate notice is given to defendants and co-conspirators that the allegations pertain to those securities. *See Mountain View Pharmacy v. Abbott Laboratories*, 630 F.2d 1383, 1387–88 (10th Cir.1980). The attachment to plaintiffs' brief listing securities is indication that such specificity is possible, even prior to additional discovery. Insofar as plaintiffs allege that it is only during certain periods of time within the "class period" that trading in particular securities was part of the conspiracy, they must specify the duration of that period for each stock.

**B.** *The Complaint Pleads the Acts of the Conspirators with Sufficient Specificity*

Defendants further contend that the standards of Rule 8 has not been satisfied with respect to facts indicative of joint action among the alleged co-conspirators. Rule 8 requires a "short and plain statement of the claim showing that the pleader is entitled to relief." In the situation presented by this case, the Rule requires that the Court determine what degree of factual allegations are required to allow the parties to move forward, when the primary basis of the complaint is allegations in the press and disputed theories of academics.

■ The requirements of Rule 8 in the context of conspiracy have been described as follows:

[T]he general principles of "notice pleading" under Rule 8 apply to pleading averring conspiracy. However, while Rule 8 demands only a "short and plain statement of the claim showing that the pleader is entitled to relief," in a pleading of conspiracy it is important that within the pleader's ability to do so, and without going into unnecessary detail, the opposing party be informed of the nature of the conspiracy charge, to which he may adequately plead. It is not enough merely to state that a conspiracy has taken place. Where possible, there should be some details of time and place and the alleged effect of the conspiracy. This is not to say that the pleader must plead his evidence; further details may be secured by means of discovery, and related devices. Moreover, great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading.

2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 8.17[5] (1986) (footnotes omitted).

■ This description has been cited with approval in this Court in the context of complaints alleging federal antitrust conspiracy. *See State of New York v. Cedar Park Concrete Corp.,* 665 F.Supp. 238, 246–47 (S.D.N.Y.1987). As the Court in *Cedar Park* held:

An overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits.

The flaw with this Complaint is not that there is no specific act attributed to each defendant, but, as described above, that there is no notice as to which stocks the plaintiffs believe are the object of the conspiracy.

In fact, the plaintiffs allege a number of specifics with regard to the conspiracy: that there is an agreement to match the spread set by a "name" in each security; that there is an agreement to eliminate the odd eighths; and that market makers are pressured and threatened not to break the spread. The Complaint provides some defendant-specific examples of the latter reported in the public press, but each of the allegations alone is more than a conclusory recitation of the language of the Sherman Act.

Additionally, the plaintiffs allege that the fact that the larger than one-eighth spread is maintained would not occur in the absence of a conspiracy to maintain the spreads. They describe the behavior of securities on other exchanges and the change that occurs in stock that moves from Nasdaq to other exchanges as proof of an artificial spread. The Complaint also alleges that after DOJ began its investigation into allegations of fixed spreads, the spreads of major securities traded on Nasdaq narrowed and that after the publication of an academic article "indicating collusion in fixing of the Nasdaq spreads," the spreads narrowed on several other major securities. The nature of the conspiracy is sufficiently pled in this case to withstand a motion to dismiss. *See State of New York v. Cedar Park Concrete Corp.,* 665 F.Supp. 238 (S.D.N.Y.1987).

In *Cedar Park,* the defendants were producers and sellers of ready-mixed concrete, builders, or individuals who played significant management roles in the New York City major reinforced-concrete superstructure market. The theory of that complaint was that any and all major reinforced concrete superstructure projects in New York City performed during a specified period was subject to the effects of a conspiracy to fix prices. *See Cedar Park,* 665 F.Supp. at 242. In that complaint the Court found that plaintiffs specified many of the particular projects, and that in effect since the universe was all major projects in New York City, the defendants had sufficient notice of the allegations. *See Id.* at 247. There were not specific allegations attributed to each of the defendants.

Most of the cases cited by defendants are distinguishable from this case largely because the cases, all of which were dismissed, alleged no facts at all regarding the elements of the conspiracy and often simply recited the statutory language of the Sherman Act. For example, in *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 837 (S.D.N.Y.1988), the only allegation of conspiracy cited by the court was a single conclusory allegation that certain defendants had "conspired and contracted with [other defendants] . . . to restrain trade." Similarly in *Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 221–22 (4th Cir. 1994), the Fourth Circuit dismissed an antitrust claim that "merely reiterated mechanically the words of the Sherman Act. . . ."

Plaintiffs in this District have not been required to specify individual acts of each defendant in an antitrust conspiracy allegation. In addition to *Cedar Park* discussed above, in *Alco Standard Corp. v. Schmid Brothers, Inc.,* 647 F.Supp. 4 (S.D.N.Y.1986) the court held that ("[i]t is not necessary to plead either the evidence or the facts upon which antitrust conspiracy are based. . . . Plaintiff has identified the co-conspirators and described the nature and effect of the alleged conspiracy. This is sufficient. . . ."). In *Alco,* a case involving numerous defendants, plaintiff had only alleged specific conspiratorial acts between two defendants. In this case, all major market-makers are al-

leged to participate in the conspiracy to maintain the artificial spread.[6]

While the defendants fault the Complaint for relying heavily on economic studies and assert that "neither the complaints speculative economic assumptions nor the academic and media articles that inspired the complaint support and inference of conspiracy," they cite no authority for the proposition that the heavy reliance on such theory is fatal to this Complaint. In fact, the Complaint asserts the sort of conscious parallelism that courts have permitted in alleging Sherman Act conspiracies. (See discussion in next section.)

Viewing the Complaint's allegations as a whole, there is a sufficient basis to withstand this motion to dismiss and to provide defendants with notice of the sorts of activities and of the purpose of the conspiracy, were the subject stocks identified. *See e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410–11, 8 L.Ed.2d 777 (1962) (reinforcing notion that a complaint should be viewed as a whole). *Accord Apex Oil Co. v. DiMauro*, 822 F.2d 246, 255 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *In re Workers' Compensation Ins. Antitrust Litig.*, 867 F.2d 1552, 1563 (8th Cir.), *cert. denied*, 492 U.S. 920, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989).

Both parties cite *Klebanow v. New York Produce Exchange*, 344 F.2d 294, 299 (2d Cir.1965) for the proposition that a complaint is insufficient if it "furnishes not the slightest clue as to what conduct by the defendants is claimed to constitute 'an illegal contract combination and conspiracy.'" With the glaring exception of identifying the stocks at issue, the plaintiffs have alleged what the defendants did. There is much more than the "slightest clue."

**C. The Complaint Alleges Sufficient "Plus Factors" to Withstand a Motion to Dismiss.**

As a related issue, defendants criticize the Complaint for alleging nothing more than conscious parallelism.

■ An antitrust conspiracy complaint is adequate as long as there are allegations "from which an inference of an unlawful agreement can be drawn." *Brett v. First Federal Savings & Loan Association*, 461 F.2d 1155, 1158 (5th Cir.1972). "It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to this arrangement." *Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 614 (2d Cir.1979), *cert. dism'd*, 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980), quoting *United States v. Paramount Pictures*, 334 U.S. 131, 142, 68 S.Ct. 915, 922, 92 L.Ed. 1260 (1948). As the *Ambook* court noted, the Supreme Court in *Paramount* "found the point of drawing an inference from conscious parallelism scarcely deserving of elaboration." *Ambook*, 612 F.2d at 614.

In *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253–54 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987), the Court of Appeals has held that:

[s]ince mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunctions with the parallel acts, can serve to allow a fact-finder to infer a conspiracy.

*Id.*, citing *In re Plywood Antitrust Litigation*, 655 F.2d 627, 633 (5th Cir.1981).

■ "Plus factors" identified by courts, which, in combination with parallel pricing, may support an inference of conspiracy, include a common motive to conspire,[7] actions

---

**6.** *See also, Barr v. Dramatists Guild, Inc.*, 573 F.Supp. 555, 559 (S.D.N.Y.1983) ("[T]here is no requirement that a plaintiff plead with particularity every overt act allegedly committed by a defendant in furtherance of a conspiracy or the precise role played by an alleged conspirator."); *Julius Nasso Concrete Corp. v. DIC Concrete Corp.*, 467 F.Supp. 1016, 1025 (S.D.N.Y.1979) (plaintiff "has set forth facts that may amount to

a conspiracy; it is merely unable at this time to particularize the roles allegedly played by the named individuals. Before any discovery has been taken, this is enough....").

**7.** *See Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 616 (2d Cir.1979); *Apex Oil Co. v. Joseph DiMauro*, 822 F.2d 246, 253 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d

which were against their own individual business interest absent an illicit agreement,[8] and evidence of coercion.[9]

■ At the stage of a motion to dismiss, a complaint must "allege, at a minimum, the legal and factual theory upon which [the] claim of interdependent conscious parallelism rests." *Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. 649, 675 (S.D.N.Y. 1980). *See also, Bogosian v. Gulf Oil Co.*, 561 F.2d 434, 446 (3rd Cir.1977) (holding that it was sufficient in alleging conspiracy based on conscious parallelism to show a detailed provisions of a parallel lease provisions and that it was unnecessary:

> for plaintiffs to plead the basis upon which that combination will be proven. The goals of efficient judicial administration are retarded, not advanced, when the pleadings are used as a battleground for legal skirmishes without the necessary factual development upon which to focus decision.)

■ Plaintiffs have not only alleged that the market makers are acting in a similar fashion, they have alleged that without an agreement it would be in the best interest of the individual defendants to go within the spread, that they stand to increase their profits by virtue of the conspiracy, and that the defendants are in continuous communication with one another and that coercion is employed to enforce the spreads. While the Complaint could have been more specific if information provided only in the brief had been pled, the Complaint includes recognized plus factors which are sufficiently plead to meet the requirements of 8(a). The theory of the conspiracy is thus adequately alleged although the factual support at this stage in the proceeding rests primarily on inference, press reports and circumstantial evidence.

In *Monument Builders of Greater Kansas City, Inc. v. American Cemetery Assn. of Kansas*, 891 F.2d 1473, 1482 (10th Cir.1989), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2168, 109

L.Ed.2d 498 (1990) the Tenth Circuit held that allegations that defendants' pricing bore no reasonable relation to either the operation of defendants' business or market or economic conditions, was sufficient to create a reasonable inference of conspiracy. The *Monument Builders* Court held that "although plaintiff has pleaded virtually no facts that would constitute direct evidence of an agreement, it has made sufficient circumstances to overcome the minimum requirements of Rule 8(a)." 891 F.2d at 1481. Similar allegations were made by plaintiffs here and are sufficient to withstand a challenge on 8(a) grounds. *See* Complaint at ¶¶ 102, 104, 105 and 110.

Defendants propose lawful explanations for the parallelism alleged in the behavior of the Nasdaq stocks, including the reduction of the spreads after attention was focussed on the market. While these contentions may supply the grounds for a motion for summary judgment, they are out of place in a motion to dismiss. *See In re Brand Name Prescription Drugs Antitrust Litigation*, 1994 WL 240537 at *4 (N.D.Ill.1994) ("Notwithstanding the possibility that the [defendants] could present 'plausible explanations' for the alleged conduct at trial, such an inquiry at this juncture [on a motion to dismiss], is not appropriate").

Finally, defendants allege that "the complaint rests virtually in its entirety on theoretical economic propositions, none of which is supported by allegations of fact, but which are instead entirely beholden to a limited, flawed academic article." The Complaint alleges more than the findings of an academic study, the theoretical soundness of which is not the issue at the point of a motion to dismiss. What is at issue is the adequacy of the conspiracy allegations of joint enforcement, coercion, and restraint of trade. Whatever the proof may show, the allegations of conspiratorial activity are adequate.

---

487 (1987); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *In re Plywood Antitrust Litigation*, 655 F.2d 627, 633 (5th Cir.1981), *cert. dism'd*, 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983); *U.S. v. Phelps Dodge Industries, Inc.*, 589 F.Supp. 1340, 1354 (S.D.N.Y.1984).

**8.** *See Apex*, 822 F.2d at 254; *Bogosian*, 561 F.2d at 445.

**9.** *Ambook*, 612 F.2d at 616.

715

### Conclusion

For the reasons described above, Defendants' motion to dismiss is granted and the Complaint is dismissed with leave to replead within 45 days.

It is so ordered.