UNITED STATES of America, Plaintiff,

v.

ALEX. BROWN & SONS, INC.,
et al., Defendants.

No. 96 Civil 5313(RWS).

United States District Court,
S.D. New York.

April 23, 1997.

U.S. Department of Justice, Antitrust Division, Washington, DC, for United States of America; Hays Gorey, Jr., Andrea Limmer, John D. Worland, Jr., Jessica N. Cohen, of counsel.

Shearman & Sterling, New York City, for Defendants; James T. Halverson, Joseph T. McLaughlin, of counsel.

Fine, Kaplan and Black, Philadelphia, PA, for Intervenors; Arthur M. Kaplan, of counsel.

Lovell & Skirnick, New York City, for Intervenors; Christopher Lovell, Robert A. Skirnick, of counsel.

Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, for Intervenors; Leonard B. Simon, of counsel.

SWEET, District Judge.

In this civil antitrust enforcement action, the United States has moved, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), for entry of a stipulation and order (the "Order" or the "Consent Decree") terminating the action.

For the reasons set forth below, the motion will be granted, and the Order will be entered.

## Parties

Defendants Alex. Brown & Sons Inc., Bear, Stearns & Co., Inc., CS First Boston Corp., Dean Witter Reynolds, Inc., Donaldson, Lufkin & Jenrette Securities Corp., Furman Selz LLC, Goldman, Sachs & Co., Hambrecht & Quist LLC, Herzog, Heine, Geduld, Inc., J.P. Morgan Securities, Inc., Lehman Brothers, Inc., Mayer & Schweitzer, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co., Inc., Nash, Weiss & Co., Olde Discount Corp., Painewebber Inc., Piper Jaffray Inc., Prudential Securities Inc., Salomon Brothers Inc., Sherwood Securities Corp., Smith Barney Inc., Spear, Leeds & Kellogg, LP, and UBS Securities LLC (collectively, the "Defendants") are or were market makers on the NASDAQ exchange and purchased and sold stock on NASDAQ.

The Antitrust Division of the United States Department of Justice (the "Government" or the "DOJ") initiated this action alleging that the Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in a form of price fixing.

The Intervenors are plaintiffs in *In re NASDAQ Market–Makers Antitrust Litigation*, M.D.L. No. 1023, a private multidistrict class action (the "Multidistrict Action") alleging antitrust violations and seeking damages and injunctive relief.

## Prior Proceedings

The facts and prior proceedings in this action are set forth fully in the prior opinion of this court, familiarity with which is assumed. *See, United States v. Alex. Brown &*

*Sons, Inc.,* 169 F.R.D. 532 (S.D.N.Y.1996). Further background is provided in the opinions on the related Multidistrict Action. *See, In re NASDAQ Market-Makers Antitrust Litigation,* 894 F.Supp. 703 (S.D.N.Y.1995); 164 F.R.D. 346 (S.D.N.Y.1996); 1996 WL 187409 (S.D.N.Y.1996); 929 F.Supp. 723 (S.D.N.Y. 1996); 929 F.Supp. 174 (S.D.N.Y. 1996); 938 F.Supp. 232 (S.D.N.Y.1996); 169 F.R.D. 493 (S.D.N.Y.1996); 172 F.R.D. 119 (S.D.N.Y.1997).

After extensive investigation, the Government filed the complaint in this civil action on July 17, 1996, pursuant to Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, seeking equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1.

On the same day the complaint was filed, the United States and the Defendants filed the Order to resolve the allegations in the complaint. In accordance with procedures outlined in the APPA, the Government submitted materials to the Court, including a Competitive Impact Statement ("CIS") summarizing the evidence supporting the allegations in the complaint and describing the resolution set forth in the proposed Consent Decree. The Government also published proposed settlement documents in the Federal Register and newspapers, thus initiating the process of public comment and court consideration of the proposed Consent Decree required by the Tunney Act.

By opinion dated November 26, 1996, the plaintiffs in the parallel Multidistrict Action were granted leave to intervene in this action for the limited purpose of objecting to Paragraph IV(C)(6) of the Consent Decree, which provides that tape recordings of trader conversations made by the Defendants for enforcement purposes would not be subject to civil process or admissible in evidence, except at the instance of specified Government enforcement and self-regulatory agencies. The November 26 opinion also denied the Intervenors' motion to compel disclosure of a "Settlement Memorandum" created by the Government. *See United States v. Alex. Brown & Sons, Inc., supra.*

On November 18, 1996, the Government made the instant motion to enter the Order and filed with the Court its Response to Public Comments, as required by the Tunney Act. 15 U.S.C. § 16(d). The Government, Defendants and Intervenors submitted further briefing on Paragraph IV(C)(6) of the proposed Order. Pursuant to 15 U.S.C. 16(f), a public hearing on the consent decree was held on January 14, 1997, at which time the matter was deemed fully submitted.

*The Facts*

In its complaint, the Government alleged that the Defendants and other NASDAQ market-makers adhered to and enforced a "quoting convention" that was designed to and did deter price competition among the Defendants and other market makers in their trading of NASDAQ stocks with the general public. Specifically, the complaint alleged that the Defendants had agreed among themselves to avoid "odd-eighth" quotes on certain securities, thus effectively raising the minimum transaction cost to purchasers and sellers, since one-eighth is the smallest ask-bid increment that can be quoted. The Government believed that investors incurred higher transaction costs for buying and selling NASDAQ stocks than they would have incurred had the Defendants not restrained competition through their illegal agreement.

The Government contends that the proposed Order will eliminate the anticompetitive conduct identified in the complaint and establish procedures that will ensure that such conduct does not recur. Specifically, the proposed Order seeks to prevent the Defendants from agreeing with other market makers to adhere to the quoting convention, or to fix, raise, lower, or maintain prices or quotes for NASDAQ securities. The proposed Order also requires each Defendant to adopt an antitrust compliance program and designate an antitrust compliance officer (the "ACO") to ensure the firm's future compliance with the antitrust laws. To this end, the proposed decree requires the compliance officer to: (1) randomly monitor and tape record telephone conversations between stock traders; and (2) report any violations of the proposed Order within ten business days to the Antitrust Division of the Department of Justice. The taping provisions are to remain in effect for five years. The re-

mainder of the Decree expires ten years after entry.

The proposed Decree also requires that these tape recordings be made available to the DOJ for its review. The proposed Order gives the DOJ authority to receive complaints of possible violations, to visit Defendants' offices unannounced to monitor trader conversations as they are ongoing, to direct taping of particular suspected violators, and to request copies of tapes as they are made.

Paragraph IV (C)(6) of the proposed Order provides:

Tapes made pursuant to this stipulation and order shall be retained by each defendant for at least thirty (30) days from the date of recording, and may be recycled thereafter. Tapes made pursuant to this stipulation and order shall not be subject to civil process except for process issued by the Antitrust Division, the SEC, the NASD, or any other self-regulatory organization, as defined in Section 3(a)(26) of the Securities Exchange Act of 1934, as amended. Such tapes shall not be admissible in evidence in civil proceedings, except in actions, proceedings, investigations, or examinations commenced by the Antitrust Division, the SEC, the NASD, or any other self-regulatory organization, as defined in Section 3(a)(26) of the Securities Exchange Act of 1934, as amended.

In this opinion, Paragraph IV(C)(6) will be referred to as the "non-disclosure" provision or the "prospective protective order."

Prior to the initiation of this lawsuit, at least ten of the Defendants taped trader telephone conversations. None of the Defendants currently tapes its telephone calls. Defendants' counsel has submitted an affidavit indicating that the Defendants will not voluntarily tape trader conversations without the protections of Paragraph IV(C)(6).

### Discussion

The Tunney Act directs the district court to determine whether the proposed Consent Decree is "in the public interest" before entering judgment and identifies several factors that the Court may consider in making this determination. 15 U.S.C. § 16(e).

Section 16(e) provides:

Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. For the purpose of such determination, the court may consider—

(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;

(2) the impact of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

While the Tunney Act was designed to prevent "judicial rubber stamping" of proposed Government consent decrees, see H. Rep. No. 93–1463, 93rd Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 6535, 6538, the Court's role in making the public interest determination is nonetheless limited. The Court's function is not to determine whether the proposed Decree results in the balance of rights and liabilities that is the one that will best serve society, but only to ensure that the resulting settlement is "within the reaches of the public interest." United States v. Microsoft Corp., 56 F.3d 1448, 1460 (D.C.Cir.1995) (citations and internal quotations omitted). Moreover, the Government's judgment with respect to the public interest in a Tunney Act proceeding is entitled to deference. Id. at 1461 (when proposed decree comes before district judge as settlement between the parties, district judge "must be even more deferential to the government's predictions as to the effect of the proposed remedies than he would be when a modification request is presented").

In enacting the Tunney Act, Congress recognized the "high rate of settlement in public antitrust cases" and wished to "encourage[ ] settlement by consent decrees as part of the legal policies expressed in the antitrust

laws." H.R. Rep. 93–1463 at 6. It wanted to remedy abuses in the consent decree process by focussing judicial and public scrutiny on "the Justice Department's decision to enter into a proposal for a consent decree," *id.* at 7, but not at the expense of eliminating the decree as a practicable means of resolving antitrust matters. The purpose of the competitive impact statement, the public comment procedures, and the requirement that a defendant reveal lobbying contacts with the government (15 U.S.C. 16(g)), are "to enable a court to determine whether a proposed consent decree is in the 'public interest' " *id.* at 21, not to evaluate the strength of the Government's case.

The public interest inquiry is a flexible one, *United States v. Western Elec. Co.*, 900 F.2d 283, 309 (D.C.Cir.1990). However, that flexibility must be exercised with due deference to the Government's evaluation of the case and the remedies available to it.

Based on consideration of all of the factors and arguments before the Court, it is concluded that the Consent Decree as proposed is "within the reaches of the public interest," and thus will be entered.

## I. *The Challenge to Paragraph IV(C)(6)*

The Consent Decree secures significant public benefits by providing effective enforcement of its prohibitions against concerted practices—such as agreements to "fix, raise, lower, or maintain quotes or prices for any NASDAQ security" or to "fix, increase, decrease, or maintain any dealer spread, inside spread, or the size of any quote increment (or any relationship between or among dealer spread, inside spread, or the size of any quote increment), for any NASDAQ security"—and against unilateral conduct such as "harassment or intimidation of any other market maker ... for decreasing its dealer spread or the inside spread in any NASDAQ security." *See* Paragraph IV.A.

A major monitoring and enforcement provision of the proposed Decree is contained in Paragraphs IV.C, the taping provisions described above. Paragraph IV.C requires each Defendant to install "a system or systems capable of monitoring and recording any conversation on the telephones on its OTC desk used ... to make markets in NASDAQ securities."[1] Further, each Defendant must conduct its taping and monitoring operations according to a methodology approved by the Antitrust Division.[2] A Defendant may be required under the Decree to tape-record not less than 3.5% of its traders' conversations, up to a maximum of 70 hours per week.

Paragraph IV.C(4) requires that all conversations recorded pursuant to the Decree be listened to by the Defendant's designated Antitrust Compliance Officer. If the ACO finds any conversations that s/he "believes may violate" the Decree, s/he must provide them to the Government within ten days. Paragraph IV.C(7) permits the Antitrust Di-

---

1. "OTC desk" is defined to mean "any organizational element of a defendant engaged in market making, or its successor, that accounted for ten percent (10%) or more of such defendant's total market-making volume, measured in shares, in NASDAQ securities in the immediately preceding fiscal year."

2. In addition to the monitoring and taping provisions, the proposed Order contains provisions designed to ensure compliance that are typical of government antitrust consent decrees. Each defendant is required to "[i]nitiate and maintain an antitrust compliance program." As part of this program, each Defendant must appoint an Antitrust Compliance Officer ("ACO") who is required to establish and maintain a "compliance program designed to provide reasonable assurance of compliance with ... [the Order] and with the federal antitrust laws by the defendant." Under the compliance program, the ACO must distribute the Order to all members of the Defendant's board of directors (or, if there is no board, to persons with substantially equivalent responsibilities) and to all of the Defendant's employees and officers with responsibilities for market making in any NASDAQ security. The ACO must also conduct semi-annual briefings of all employees, officers and board members "on the meaning and requirements of the federal antitrust laws" and the Order; he must also advise them that he is available to confer with them regarding compliance issues. Further, the ACO must obtain written certification from each employee, officer and director required to be provided with a copy that he or she has read the Order and agrees to abide by it—as well as having been advised that a violation "may result in his or her being found in civil or criminal contempt of court." Finally, the ACO must maintain records that will identify the persons who received copies of the Order and who gave the required certifications.

vision to monitor trader conversations as they are occurring, without advance notice to the Defendant firms and without any notice to the particular traders being monitored. The Government may also request any tape recordings made pursuant to the Decree within thirty days of their creation. The Government may also direct a Defendant to record the conversations of a particular trader and supply those recordings to the Antitrust Division.

The Government contends that these monitoring provisions are unprecedented and provide a particularly strong deterrent to violations of the Decree and federal law, since a trader will know he or she may, at any given time, be monitored by his or her firm's ACO or by the Government directly. The power of the Government to demand tapes also provides a mechanism to determine whether the Defendants' ACOs are reporting possible infractions, as required by the Decree, thus deterring under-reporting by the ACOs. The evidence generated by the taping conducted under the Consent Decree would be available to the Department of Justice, the Securities and Exchange Commission and the NASD, as well as other specified securities industry self-regulatory organizations. These entities could use information gleaned from the tapes to investigate and prosecute violations of the Consent Decree or federal law and seek potentially heavy civil or criminal sanctions. The tape recording provision would yield extremely high-quality evidence to support contempt or other charges, thus maximizing the ability of the Government to punish antitrust violators and vindicate the public interest in securities markets unencumbered by anticompetitive practices.

Moreover, the Defendants and the Government urge that such monitoring of trader conversations would not be possible without the consent and cooperation of the Defendants. The Government and the Defendants contend that the non-disclosure provisions of Paragraph IV.C(6) constitute an essential *quid pro quo* for the Decree requirement that the Defendants create and maintain for the Government tape recordings of trader telephone conversations, and that such taping would not occur if not for the disclosure restrictions. Moreover, the magnitude of the monitoring activity would be impossible for the Government to institute itself, since it would not have the financial or human resources to staff the activity. Finally, the Government urges that approval of the taping and monitoring provision here will serve as a valuable precedent for similar remedies that leverage Defendants' resources to monitor compliance in future antitrust cases.

The Intervenors object to Paragraph IV(C)(6) on a variety of grounds. However, their primary contention is that the parties to a consent decree do not have the legal power to diminish by agreement the legal rights of non-parties to evidence that would otherwise be discoverable and admissible in private litigation.

■ Consent decrees have attributes of both contracts and judicial decrees; this "dual character" has implications for the treatment of such decrees in different contexts. *Local No. 93 v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986). A consent decree has attributes of a contract because its terms are arrived at through mutual agreement of the parties. *U.S. v. I.T.T. Continental Baking Co.,* 420 U.S. 223, 236–37 & n. 10, 95 S.Ct. 926, 934–35 & n. 10, 43 L.Ed.2d 148 (1975); *U.S. v. International Brotherhood of Teamsters,* 998 F.2d 1101, 1106 (2d Cir.1993).

■ Generally speaking, parties to a consent decree cannot "consent" to disregard otherwise valid law, or "consent" to enlarge their own legal rights. *See, e.g., Perkins v. City of Chicago Heights,* 47 F.3d 212, 216 (7th Cir.1995) ("While parties can settle their litigation with consent decrees, they cannot agree to 'disregard valid state laws,' and cannot consent to do something together that they lack the power to do individually.") (citations omitted); *People Who Care v. Rockford Board of Education,* 961 F.2d 1335, 1337 (7th Cir.1992) ("When the parties to a decree seek to *enlarge* their legal entitlements—to grant themselves rights and powers that they could not achieve outside of court—their agreement is not enough.") (emphasis in original).

■ The proposed prospective "protective order" raises concerns about the extent to

which parties may use the Consent Decree as a mechanism to protect evidence that, if not created pursuant to the Order, would ordinarily be accessible to future litigants. In general, parties may not by consent decree hold under seal existing evidence that would ordinarily be accessible to other litigants. *See Olympic Refining Co. v. Carter*, 332 F.2d 260, 265 (9th Cir.1964) ("[A] consenting defendant in a Government antitrust suit gains whatever benefit there may be in accepting the terms of the consent decree rather than risking a more onerous decree entered after litigation. A consenting defendant also benefits from the saving in litigation expense which is made possible by a consent decree. But neither in the express nor implied terms of the statutes or rules is there any indication that a consenting defendant could gain the additional benefit of holding under seal, or stricture of nondisclosure, for an indefinite time, information which would otherwise be available to the public or at least to other litigants who had need of it"); *see also Ex parte Uppercu*, 239 U.S. 435, 36 S.Ct. 140, 60 L.Ed. 368 (1915); *Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 823 F.2d 159 (6th Cir. 1987).

■ However, the parties here have not attempted to disregard or annul any otherwise valid law, to abrogate existing claims or impose duties or obligations on third parties. *People Who Care* involved an attempt, in a school desegregation lawsuit, to alter a collective bargaining agreement without the consent of the affected teachers' union. The proposed settlement would have altered the teachers' seniority and assignment rights. The Court of Appeals held that, without a finding of probable success on the merits and that alteration of the teachers' seniority and assignment rights was a necessary remedy for a legal wrong, the district court could not override the seniority provisions of the collective bargaining agreement. 961 F.2d at 1339. Similarly, in *Perkins*, the court held that private parties cannot agree to disregard valid state laws governing changes in organization and boundaries of local government units. For such laws to be overridden, the court would first have to find a violation of federal law. 47 F.3d at 216.

Moreover, in contrast to the cases prohibiting the permanent sealing of evidence, the parties' proposed Consent Decree here will not abrogate the rights of third parties to concrete evidence that is already in existence. The tapes that the Intervenors assert that they and others should have a "right" to discover do not yet exist; they will not exist unless the Decree is approved and entered. In *Olympic Refining*, by contrast, the information sought was not created in reliance on the sealing provisions at issue; the information existed and would have been discoverable absent the protective order. 332 F.2d at 265.

Similarly, in *Ex Parte Uppercu*, 239 U.S. 435, 36 S.Ct. 140, 60 L.Ed. 368 (1915), the lower court ordered a deposition and exhibits sealed. In reversing the lower court, the Supreme Court held that "so long as the object physically exists, anyone needing it as evidence at a trial has a right to call for it, unless some exception is shown to the general rule." *Id.* at 440, 36 S.Ct. at 141. The objects at issue in *Uppercu* were already in existence and were not created as in exchange for settlement of a government antitrust case or in reliance on confidentiality provisions of a consent decree. The fact that the tapes will not exist without the protections provided by the Decree constitutes an exception to the general rule stated in *Uppercu*.

In *Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 823 F.2d 159 (6th Cir.1987), the issue was whether sealed tape recordings that had been made for private purposes and had been delivered to a bankruptcy trustee could be discovered from the trustee by a civil antitrust plaintiff. The Court of Appeals reversed and remanded the district court's decision to refuse to vacate or modify its sealing order "because the record does not reflect the district court's consideration of the strong underlying tradition of open records, and that only compelling reasons justify denial or continued denial of access to records of the type sought by appellant...." *Id.* at 164. Again, these records were already in existence at the time they were sought and were not created as a condition of

settlement of a government enforcement action.

The proposed Decree here promotes the public interest in ensuring that competition is restored to a market that has been subject to an alleged restraint on competition. Taping offers the public enhanced assurance that traders will not conspire against the public interest. For this "compelling" reason—and to obtain the other public benefits provided by the decree—it is permissible to limit the evidentiary uses of the tape recordings the decree will require the Defendants to create.

Moreover, the use of protective orders as a means of obtaining voluntary production of information that would otherwise be withheld has been approved by the Second Circuit. In *Martindell v. International Tel. & Tel. Corp.*, 594 F.2d 291, 295–96 (2d Cir. 1979), for example, the Court upheld an order limiting discovery of the testimony of a witness who had agreed to testify without asserting his Fifth Amendment privilege in order to settle a dispute. The witness in *Martindell* would not have provided testimony in the absence of the protective order, just as the Defendants here would not create the tapes in the absence of the protections provided by the Decree. *Cf. In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir.1993) (recognizing that party that shares interests with government does not necessarily waive work-product protection where it makes voluntary disclosures to government in course of investigation and government agrees to confidential treatment of materials).

Moreover, in recognizing certain investigatory privileges, courts have applied reasoning that supports the approval of Paragraph IV(C)(6) of the proposed Consent Decree as a means of enhancing Government enforcement efforts. For example, in *In re LTV Securities Litigation*, 89 F.R.D. 595 (N.D.Tex.1981), the court refused discovery of certain materials generated by a "Special Officer" to a class of private plaintiffs in a securities fraud class-action lawsuit, creating a hybrid "Special Officer privilege."[3] The Special Officer had been appointed in accordance with the provisions of a Final Judgment, "in the nature of a consent decree between the SEC, LTV ... [and others]," 89 F.R.D. at 614, to conduct an investigation and make recommendations. The Judgment ordered:

> LTV and J & L [a co-defendant and subsidiary of LTV] to investigate practices leading to the [earlier filed] SEC Complaint and conduct of their personnel involved in those practices. The Final Judgment contemplate[d] that the investigation [would] be conducted by the Special Officer, who [would] report to the Audit Committee [of LTV]. The Audit Committee, in turn, [was] to make its recommendations to the Board of Directors of LTV concerning questionable accounting and auditing practices and whether any action should be brought against any director, officer or employee for material misconduct.

*Id.*

The Court's order obliged LTV to " 'cooperate fully' with the Special Officer." *Id.* LTV was required by the Final Judgment to retain the Special Officer to implement the SEC consent decree, but was "not the final arbiter of the Special Officer's duties, functions or authority." *Id.* The Court retained the authority to resolve disagreements between the Special Officer and LTV concerning the officer's duties, functions or authority. *Id.*

The Special Officer was obliged to provide the SEC with "any documents, statements or other information in his possession as well reports or recommendations he prepare[d] prior to submitting them to LTV." *Id.* at 615. The decree also gave the SEC the right to confer with the Special Officer. As the Court recognized, in many ways, the Special Officer was "more akin to a public official than privately retained counsel." *Id.*

---

**3.** The reasoning behind the limited "self-critical analysis privilege" provides another basis for justifying the Decree's non-disclosure provision. *See Troupin v. Metropolitan Life Ins. Co.*, 169 F.R.D. 546 (S.D.N.Y.1996). The "self-critical analysis privilege" recognizes that, in the absence of privilege, parties would be deterred from creating self-critical reports, which are otherwise valuable to society. *Id.* at 547–48.

Given this dual role, the Court considered the privilege issue by assessing whether the work of the Special Officer, if done by an SEC investigator, would be discoverable, and concluded that the "information or documents obtained" would be "considered confidential under the Commission's regulations" and could not be obtained under the Freedom of Information Act. *Id.* at 617. The Court also concluded that "the work of an SEC investigator [could not be discovered] under Fed.R.Civ.P. 26" without a showing of "hardship that overcomes the Executive branch's privilege to protect the integrity of its law enforcement investigations," and that the class plaintiffs could not show such hardship. *Id.* at 617–18.

Although neither the attorney-client nor work-product privilege applied to the documents in question, the Court denied access to them under a "hybrid" privilege. The Court noted that "[s]pecial investigative counsel are an increasingly common element of SEC consent decrees," and concluded that "[i]n resolving this discovery dispute, this court must take cognizance of how the requested discovery may affect this developing procedure of negotiated corporate self-investigation." *Id.* at 618.

> Allowing the type of discovery requested here may kill the goose that lays the golden egg—the Commission may be deprived of a useful enforcement option, while shareholders will hardly be benefited by inhibiting corporate self-investigation. *That this species of "private ordering" or more accurately, "shared ordering", brings to the SEC's investigative-regulatory role a dimension of potentially great public benefit cannot be denied. The SEC simply cannot staff individual cases with lawyers of [the Special Officer's] experience, skill and support facilities; at least not without great risk of misallocation of its resources,* We ought at least acknowledge that the choice before us may be between assembling a beefed-up administrative super-force capable of staffing investigations of any size and the practice of regulatory triage. This is not to suggest that we sit as a supportive arm of the SEC. It is to say that we must construe claims of privilege in their true factual context to ensure that the underlying policy justifications are served.

*Id.* at 619 (emphasis added).[4]

The Court concluded that if discovery were allowed, corporations would be "less willing to engage in this sort of self-investigation," and thus denied discovery, rejecting movants' claims that, unless the Special Officer's records fell squarely within an existing recognized privilege, they were discoverable. *Id.* The Court also recognized that "[c]hanging circumstances require courts constantly to review the need for and extent of existing privileges. Similarly, as an evolving society engenders new relationships, courts must consider whether interests are created that require some form of protection." *Id.* at 621 (*citing Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)).

The Court concluded that the class action plaintiffs had shown no need for discovery of the Special Officer's reports "that justifies the adverse impact rejection of a special officer's privilege would have on this investigation and on the Commission's ability to negotiate similar consent decrees." *Id.*

Similarly, in this case, without Paragraph IV.C's protections for the tapes, the Antitrust Division would be deprived of a very

---

**4.** The Supreme Court recently used similar reasoning in countenancing a patient-psychotherapist privilege. The Court in *Jaffee v. Redmond* reasoned, in part, that

> the likely evidentiary benefit that would result from the denial of the privilege is modest. If the privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation. *Without a privilege, much of the desirable evidence to which liti-*

> gants such as Petitioner seek access—for example, admissions against interest by a party—is unlikely to come into being. This unspoken "evidence" will therefore serve no greater truth-seeking function than if it had been spoken and privileged.

— U.S. ——, ——, 116 S.Ct. 1923, 1929, 135 L.Ed.2d 337 (1996) (emphasis added). Here, insistence upon the unlimited availability of the tapes may leave no tapes at all to discover, thus vitiating the enforceability of any decree or judgment ultimately entered.

powerful enforcement tool in this and future cases. It would lose the ability to leverage the private resources of the Defendants to serve the public's interest in effective enforcement of the antitrust laws.

Intervenors attempt to distinguish *LTV.* They claim first that the LTV decision rendered non-discoverable only the Special Officer's reports, not "raw evidence," such as the tapes at issue in this case. However, the *LTV* court prohibited discovery of "all documents, interview transcripts, notes, and reports generated by the Special Officer, or prepared by defendants *solely* for the use of the Special Officer." 89 F.R.D. at 622 (emphasis in original). Similarly, only those tapes generated solely as a result of the Consent Decree will be protected by the provisions of the Consent Decree. Any taping beyond the requirements of the Decree will not be subject to protection.

Intervenors also contend that the Special Officer in *LTV* was involved in an ongoing SEC "investigation," thus invoking more squarely the traditional law enforcement investigatory privilege than the situation here, where the "investigation" has been brought to a close by the Consent Decree. However, the proposed Decree requires the Defendants to be engaged in continuing self-examination and investigation of their trading practices. As a result of the mechanisms provided by the Decree, the Antitrust Division has the ability to investigate Defendants' compliance and to audit their required self-examination. Under the Decree, the Defendants must tape-record and monitor their traders' conversations to ensure that the Court-ordered-requirement that they not engage in any prohibited conduct under pain of contempt is obeyed. The Decree also requires the Defendants to collect the evidence to make possible their prosecution in the event of any failure to comply with this mandate. While there may be a metaphysical distinction between the "investigation" in *LTV* and the ongoing monitoring and enforcement envisioned by the Consent Decree, that distinction does not preclude an invocation of the principles behind the investigatory privilege as a justification for the non-disclosure provisions of the Consent Decree.

Finally, Intervenors contend that it is inappropriate to extend a blanket "privilege" under the authority of a consent decree because assertions of privilege, particularly the limited privileges recognized in *LTV* and similar cases, must be assessed in a concrete factual context, where a court can balance the need of the party seeking discovery against the justifications for protecting the materials sought. However, although the law of privileges provides a basis for evaluating the permissibility of the proposed non-disclosure provisions of the Decree, the Consent Decree itself does not create a "privilege" over existing materials in a concrete discovery dispute. Rather, it makes non-disclosure a condition for the creation of the tapes. Although the Court cannot decide whether the tapes would be privileged in the absence of the Decree, it can approve a bargain in which the parties agree that the potential evidence will only be created on specific disclosure conditions.

Accordingly, it is concluded that the non-disclosure provision of the Decree is legally permissible. However, although Paragraph IV.C may be permissible, it is still possible that the Decree with the non-disclosure provision is not "within the reaches of the public interest."

■ In determining whether a proposed decree is in the public interest, the court is to consider both "the impact of such judgment upon the public generally and individuals alleging specific injury from the violations." The Intervenors contend that the non-disclosure provision will have a negative impact on the public generally, and that it will certainly have a negative impact on the class of individuals claiming that they were injured by the Defendants' anticompetitive conduct.

Intervenors contend that the non-disclosure provisions of the Decree will thwart effective enforcement of the antitrust laws by permitting Defendants to elude the sanction of private treble damage actions. The antitrust laws provide for complementary public and private enforcement, including recovery of damages available only through private enforcement. *See* Legislative History of Hart–Scott–Rodino Antitrust Improvements Act of 1976, H.Rep. No. 94–499, 94th Cong., 1st Sess. 19–20 1975; *Mitsubishi Motors*

*Corp. v. Soler Chrysler–Plymouth,* 473 U.S. 614, 635, 105 S.Ct. 3346, 3358, 87 L.Ed.2d 444 (1985) (the "treble damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators"). Because the Government lacks statutory authority in civil proceedings to seek damages on behalf of individuals injured by antitrust violations, *see* 15 U.S.C. § 4, Intervenors contend that the non-disclosure provision will attenuate the congressional enforcement scheme by depriving private plaintiffs of high quality evidence for treble damages actions, thus effectively allowing Defendants to evade having to disgorge illegal profits from future antitrust violations. Intervenors contend that such a result would be harmful to the public in general because of the diminished deterrent effect on potential violators who may escape effective prosecution of treble damage actions. They also contend that it would be harmful to "individuals alleging specific injury," such as the class of plaintiffs in the Multidistrict Action, since they would be deprived of valuable evidence for their cases.

However, as noted above, were the Court to refuse to enter the proposed Consent Decree with the limitations on access to and use of the tapes, the Intervenors and other potential private plaintiffs might well gain nothing, since the Defendants would not voluntarily create the tapes that could arguably provide support for a private action. The Intervenors contend that equivalent relief could be obtained if the Government were to proceed to trial.

However, even assuming the Government were able to prevail in a trial on the merits in the event the Consent Decree was not approved in its present form, such a detailed and pervasive plan for taping would not necessarily be a likely, or even permissible, remedy. While the courts have "authority to use quite drastic measures to achieve freedom from the influence of the unlawful restraint of trade," *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 726, 64 S.Ct. 805, 815, 88 L.Ed. 1024 (1944), the parties have identified no antitrust cases in which a court has ordered, either after trial or through a consent decree, a similarly burdensome and intrusive monitoring regime upon private defendants. In order to obtain such relief, the Government would have to show that it was necessary to prevent future violations of the antitrust laws, *see Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969), and that such relief is no more intrusive than necessary. *See Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979).

On the other hand, if the Consent Decree is entered intact, tapes will be made available to the Antitrust Division, the SEC, the NASD and any other self-regulatory body established by the securities laws. The tapes may thus be discovered and used by government agencies to enforce the Decree, as well as to punish violations of the antitrust and securities laws in either civil or criminal actions. Moreover if portions of the tapes are used in any public proceeding brought by the Government or a self-regulatory agency, potential civil litigants may be able to obtain such evidence from the public record for use in private actions. *Cf. United States v. Amodeo,* 44 F.3d 141, 146 (2d Cir.1995) (noting presumption favoring public access to documents in judicial proceedings).

Notwithstanding, the non-disclosure provisions remain somewhat troubling. The Defendants, some of whom taped trader conversations for business purposes prior to this investigation, will be able to return to such taping, thus obtaining whatever business advantage such taping conferred without incurring the risk that the tapes will be used against them in private litigation. The possibility that the Government will discover direct evidence of violations of the Decree or of the law in the tapes, and that this evidence will be denied to private plaintiffs seeking relief from such violations, is also disturbing.

In essence, however, the question is whether extremely effective Government enforcement and monitoring is worth the price of withholding information, which otherwise probably would not exist, from potential private plaintiffs in the future. If the Decree is rejected, the Government and the public would likely lose the benefits of an extraordi-

narily powerful prophylactic and investigatory tool, and the potential plaintiffs still would be left to make their cases without the benefit of tape recordings. At bottom, then, the choices are: (1) Government enforcement using tape recorded evidence plus private enforcement without tapes; or (2) Government and private enforcement without tapes. Assuming the Government is vigilant in its role, the first choice provides stronger enforcement than the second, and thus the public interest balance tips in favor of approving the Consent Decree.

Accordingly, the non-disclosure provisions of Paragraph IV(C)(6) do not undermine sufficiently the public benefit to be derived from the decree such that the proposed Order can be said to be outside the reaches of the public interest.

## II. *Other Objections to the Consent Decree*

Professor Junius Peake, a professor of finance at the University of Northern Colorado, submitted comments indicating that he believed that the terms of the Decree were inadequate to deter retributive conduct by traders, and that the NASDAQ Stock Market, Inc. should be required to display market-maker quotes anonymously, so that market-makers breaking any quoting convention could not be identified by those wishing to retaliate. However, Professor Peake's proposed relief may not be obtained in this action because the NASDAQ Stock Market is not a defendant in the case and is not accused of any wrongful conduct. The complaint charges individual private firms, not NASDAQ, of conspiring to inflate prices.

■ William Leighton, who has bought and sold stock on the NASDAQ market, has made numerous objections to the settlement. His principal concern is that the relief does not include the payment of damages to aggrieved individuals. However, the proposed Decree does not prevent Mr. Leighton from pursuing a treble damages action under Section 4 of the Clayton Act, 15 U.S.C. § 15. Mr. Leighton also contends that there is no "case or controversy" between the Government and the Defendants because a proposed settlement was filed on the same day as the complaint. However, a case or controversy exists because the United States and the Defendants have adverse interests. *See Muskrat v. United States,* 219 *U.S.* 346, 361, 31 S.Ct. 250, 255, 55 L.Ed. 246 (1911). The fact that the United States and the Defendants have reached a settlement that would resolve the controversy currently existing between them does not mean that there is no justiciable controversy. *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 371 n. 10, 102 S.Ct. 1114, 1120 n. 10, 71 L.Ed.2d 214 (1982).

■ Mr. Leighton also suggests that the proper parties are not before the Court. He contends that the United States is not a proper plaintiff because it is private parties, not the Government, who are injured by the conduct alleged in the complaint. However, the United States is a proper party to bring an injunctive action under Section 1 of the Sherman Act on behalf of the public. 15 U.S.C. § 4. Mr. Leighton also argues that NASDAQ and the NASD are indispensable parties pursuant to Fed.R.Civ.P. 19 because in their absence, complete relief cannot be accorded among the existing parties. However, complete relief between the existing parties can be achieved without joining NASDAQ and the NASD.

Finally, Mr. Leighton contends that the entry of the Decree will result in positive injury to third parties because a "Compilation of Evidence" is not filed as part this action, and is thus inaccessible to private plaintiffs. This contention was addressed and rejected in the prior opinion of this Court.

■ Joel Steinberg also submitted comments, objecting primarily, as did Mr. Leighton, that none of the injured parties will be monetarily compensated through this action. As stated above, the settlement in this Government action for injunctive relief will not adversely affect injured parties from bringing damage suits to obtain compensation. Mr. Steinberg also objects that no criminal charges were brought against the Defendants. However, decisions "whether or not to prosecute, and what charge to file or bring ... generally rests entirely in [the prosecu-

tor's] discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). Courts are even more deferential to a decision *not* to prosecute, such as the Government's decision not to pursue criminal sanctions here. *See Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion").

In sum, the proposed Consent Decree is within the reaches of the public interest. *See Microsoft,* 56 F.3d at 1458. It is designed to terminate the anti-competitive acts alleged in the complaint and provides a potent enforcement mechanism to effectuate that design. The ten-year duration of the Decree is adequate to ensure that the NASDAQ market is purged of anti-competitive activity. Although this Court may have preferred other remedies, the record reflects that the Government made a reasonable choice among the alternative remedies actually considered. The proposed Decree will have a positive impact on the public generally by deterring and permitting detection and punishment of future anti-trust and securities violations on the NASDAQ market. Although it is possible that a trial on the merits or an alternative decree would provide greater benefits to private individuals alleging injury from the alleged violations, the uncertainties and expense of trial and the deference owed to the Government's litigation strategy counsel against disturbing the bargain achieved by the parties.

### Conclusion

For the reasons set forth above, the Stipulation and Order is hereby entered.

It is so ordered.