UNITED STATES of America,
Plaintiff–Appellee,

v.

INTERNATIONAL BUSINESS
MACHINES. CORPORATION,
Defendant–Appellee,

Independent Service Network
International, Intervenor–
Appellant.

Docket No. 97–6184.

United States Court of Appeals,
Second Circuit.

Argued March 2, 1998.

Decided Dec. 30, 1998.

Gordon B. Spivack, Coudert Brothers, New York, NY (Ronald S. Katz, Theodore R. Snyder, Coudert Brothers, James R. Eiszner, Joseph G. Matye, Shook Hardy & Ba-

con, LLP, Kansas City, MO, of counsel ), for Intervenor–Appellant.

Adam D. Hirsh, U.S. Dep't of Justice, Washington, DC (Joel I. Klein, Asst. Atty. Gen., Donna E. Patterson, Dep. Asst. Atty. Gen., Robert B. Nicholson, John F. Greaney, N. Scott Sacks, James J. Tierney, U.S. Dep't of Justice, of counsel ), for Plaintiff–Appellee.

Evan R. Chesler, Cravath, Swaine & Moore, New York, NY (Peter T. Barbur, Cravath, Swaine & Moore, Howard Weber, Davis, Weber & Edwards, New York, NY, Donald J. Rosenberg, Kenneth B. Wildstein, International Business Machines Corp., White Plains, NY, of counsel ), for Defendant–Appellee.

Before: NEWMAN, CABRANES, and MERRITT,* Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

 This appeal has its origins in a joint motion of the parties to a longstanding antitrust decree, seeking the dissolution of that decree. By order dated May 1, 1997, the United States District Court for the Southern District of New York (Thomas P. Griesa, *Chief Judge* ) granted that motion, over the objection of an intervenor, the Independent Service Network International ("ISNI"). ISNI now appeals, contending that the district court's order ran afoul of our decision in *United States v. American Cyanamid Co.,* 719 F.2d 558 (2d Cir.1983), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984), which allows consensual termination of antitrust decrees only upon the court's determination that termination will serve the "public interest." *Id.* at 564–65. The "public interest," in turn, is to be evaluated by conducting the same analysis that would govern an antitrust case involving the species of antitrust violation that the decree is meant to forestall. *Id.* at 565. The parties to this appeal substantially agree that the species of

antitrust violation relevant here is the illegal tying arrangement, prohibited under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (the "Sherman Act").[1] ISNI maintains, however, that the district court erred by failing to even consider—much less correctly apply—the factors that govern cases of asserted tying arrangements.

Although the district court did not discuss each of the individual elements of an illegal tying arrangement, we conclude that its analysis adequately showed that one element necessary to such a violation was not present. Accordingly, we affirm.

**I.**

This case arises from a civil antitrust complaint filed against International Business Machines Corporation ("IBM") by the government in 1952. The complaint alleged, *inter alia,* that IBM had used its monopolistic market power in the electronic tabulation machine industry to force consumers to lease, rather than purchase, its machines. It further alleged that through such activity, IBM monopolized, attempted to monopolize, and restrained trade in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2.

In 1956, the government and IBM entered into a consent decree (the "Decree") rather than proceed to trial. The Decree covered both tabulating machines and the emerging market for computers, which it referred to as "electronic data processing machines." The Decree sought to encourage market competition by constraining IBM's ability to exercise its market power. Among other things, the Decree (1) required IBM to sell as well as lease its tabulating machines and computers, (2) prohibited IBM from reacquiring its machines, and (3) required IBM to sell parts and provide training to outside firms that could compete with IBM in the markets for

---

* The Honorable Gilbert S. Merritt, of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. The Supreme Court has defined a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5–6,

78 S.Ct. 514, 2 L.Ed.2d 545 (1958). A tying arrangement will violate section 1 of the Sherman Act if "the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 462, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citation omitted).

supplies and services on IBM machines. This appeal involves only provisions that implement the third aspect of the Decree.

Over the years, a number of the provisions automatically terminated; others, relating to tabulating machines, became obsolete. IBM moved, in June 1994, to terminate all remaining provisions of the Decree. In July 1995, the government agreed to terminate all of the remaining Decree provisions, except as they applied to two IBM product lines—namely, "S/390" mainframe computers and "AS/400" mid-range computers.[2] The district court thereafter entered an order terminating the Decree as to all IBM products except the S/390 and AS/400 lines. (ISNI does not appeal from this order.)

The government then proceeded to investigate the likely impact of terminating the Decree with respect to S/390 and AS/400 computers. Its detailed investigation included the review of more than 100,000 pages of IBM documents, including its strategic business plans, and interviews with IBM's customers, competitors, and executives. The government concluded that (1) the customers of S/390 and AS/400 computers were mostly large corporations, none of whom voiced concern over the termination of the Decree, and many of whom believed that they held some leverage over IBM; (2) there is currently an active secondary market for spare parts and maintenance for these machines; the independent firms that operate in this industry obtain the vast majority of their spare parts by cannibalizing existing machines and by purchasing from independent distributors; (3) there is no indication that IBM plans to cut off spare parts sales to independent firms; (4) consumers of these products "comparison shop" the expected lifetime price of parts and servicing when they choose a business computer; and (5) although the AS/400 faces a competitive market, the S/390 has a substantial share of the mainframe market.[3]

Based on the above investigation and determinations, the government concluded that termination of the remaining provisions, subject to a phase-out period, would be in the public interest. Accordingly, the government joined IBM in a motion to eliminate all remaining provisions by July 2, 2001.

The district court ordered a period of public comment regarding the termination proposal. The only comment received from an IBM customer was in favor of termination. Five comments were received from IBM's competitors or their trade associations—two favoring termination, and three (including the comment submitted by ISNI) opposing termination. IBM and the government filed lengthy responses to these public comments.

On February 13, 1997, the district court held a hearing on the joint motion, at which ISNI was allowed to participate as amicus curiae. ISNI challenged the termination of only the following sections of the Decree, and only as they relate to the S/390 and AS/400 computer lines: (1) Section VI(c), which requires IBM to sell repair parts to independent maintenance companies (and to computer owners) at reasonable and non-discriminatory prices, so long as those parts are available for use in equipment leased by IBM; (2) Section VII(c), which prohibits IBM from requiring that equipment purchasers purchase repair and maintenance services or repair parts from IBM; (3) Section IX(b), which requires IBM to provide to equipment owners—at reasonable and non-discriminatory prices—the same training and documentation pertaining to repair and maintenance that it provides to its own repair and maintenance employees; and (4) Section IX(c), which requires IBM to provide customers with documentation regarding the operation of the equipment that is owned or leased by the customer.

ISNI argued that if the Decree were terminated, IBM would cease selling parts to

---

**2.** Neither line of computer is mentioned in the Decree, which purports to cover the entire category of IBM computers. It is not clear from the record whether either product line existed in 1956.

**3.** The government also made determinations based on confidential IBM strategic planning documents. Those portions of the briefs and record which refer to these strategic planning documents have been filed under seal. Although these documents would lend further support to our ultimate conclusion in this case, we hesitate to rely upon documents whose contents we must conceal. As it happens, our conclusion in this case does not depend upon the sealed evidence.

independent service firms and would institute a tie between the computers, on the one hand, and maintenance, on the other, using its monopoly on spare parts as leverage. It appears that ISNI did not provide any evidence for these predictions, and relied entirely on the evidence gathered and presented by the government.

In an opinion dated May 1, 1997, the district court granted the joint motion of IBM and the government to terminate the Decree. *See United States v. International Business Machines,* No. 52 CIV. 72–344(TPG), 1997 WL 217588 (S.D.N.Y. May 1, 1997). The court held that termination was in the public interest, for essentially two reasons. *See id.* at *3. First, the court found that the phasing-out of the remaining Decree provisions "present[s] no material threat of violation of §§ 1 and 2 of the Sherman Act." *Id.* at *4. In support of this conclusion, the court noted that there was now an active market in computer repair services. *See id.* at *3. Moreover, the court found that this market was likely to remain even after the Decree's termination, because IBM would continue selling necessary spare parts to the independent maintenance providers; if IBM were to refuse to supply such parts to service providers, and to begin charging monopolistic servicing prices, it would risk offending potential computer purchasers. Indeed, the court emphasized that IBM faced some competition in the market for its machines, and that "the market as it exists today is a powerful deterrent against IBM engaging in monopolistic tactics designed to shut off the supply of parts to independent repair companies." *Id.*

Second, the court noted that the Decree had "resulted in artificial restraints on IBM's marketing of spare parts, which do not further the cause of healthy competition." *Id.* The court cited evidence that IBM had earlier planned to close certain of its regional parts distribution centers, on the theory that there were an excessive number; however, IBM had withdrawn these plans because of complaints that such closings would violate the Decree. *See id.*

Thereafter, ISNI sought and obtained the district court's permission to intervene for the sole purpose of bringing this appeal from the district court's May 1, 1997 order. ISNI's timely appeal followed.

## II.

Although a district court asked to approve a settlement or consent decree "normally makes only the minimal determination of whether the agreement is appropriate to be accorded the status of a judicially enforceable decree," *Janus Films, Inc. v. Miller,* 801 F.2d 578, 582 (2d Cir.1986), the court has a "larger role ... where a consent judgment or a settlement judgment resolves ... [among other things] antitrust suits brought by the United States," *id.* By statute, *see* Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "Tunney Act"), the court may approve an antitrust consent decree only upon finding that it is "in the public interest," *see id.* at § 16(e). Although the Tunney Act, by its terms, applies only to the *approval* of consent decrees, we have held that termination also requires judicial supervision—and "consider[ation of] the public interest"—as a corollary to the Tunney Act. *See American Cyanamid,* 719 F.2d at 565 & n. 7.

■ When considering a motion to terminate a consent decree, the district court's "public interest" determination must be based on the same analysis that the court would use to evaluate the underlying violation. *See American Cyanamid,* 719 F.2d at 565 (explaining that the district court was required to apply "the criteria used for determining a Clayton Act violation ... for determining the 'public interest' "). For instance, when a consent decree is designed to remedy an alleged vertical integration—as in *American Cyanamid*—the court should look to the elements of that species of antitrust violation to determine whether the present state of affairs is such that a dissolution of the decree would be in the public interest.[4] The district court's decision to terminate the Decree is reviewed for abuse of discretion.

---

4. We need not consider here whether *American Cyanamid* forecloses the possibility that other factors could additionally be considered as part of the "public interest" inquiry.

*See United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir.1995).

## III.

ISNI primarily contends on this appeal that the district court failed to apply the standard doctrinal framework governing the relevant category of antitrust violation. In particular, ISNI notes that the court failed to cite *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), the leading authority governing the antitrust issue presented in this case—namely, a seller's attempt to "tie" the sale of products and services by requiring purchasers of its products also to sign maintenance agreements. ISNI does not contend, however, that the district court's factual findings were clearly erroneous.

In *Eastman Kodak*, independent servicing operators sued the Eastman Kodak Company ("Kodak"), alleging that the latter had refused to sell spare parts for its photocopiers except to those customers who agreed to use Kodak repair services. *See id.* at 458, 112 S.Ct. 2072. In the process of holding that Kodak was not entitled to summary judgment, the Supreme Court set forth the elements necessary to prove an unlawful tying arrangement in restraint of trade: (1) the alleged arrangement must affect a substantial amount of interstate commerce, *see id.* at 462, 112 S.Ct. 2072; (2) the two products (in that case, parts and services) must be distinct, *see id.;* (3) the defendants must have actually tied the sale of the two products, *see id.;* and (4) the seller must have "appreciable economic power in the tying market" (in that case, the market for parts)—that is, "the ability of a single seller to raise price and restrict output," *id.* at 464, 112 S.Ct. 2072 (citation and internal quotation marks omitted).

█ It is true that the district court in the instant case did not recite these elements, or even cite the Supreme Court's decision in *Eastman Kodak.* Nonetheless, the district court did conclude that termination of the Decree "present[s] no material threat" of a violation of the Sherman Act, and supported its conclusion with findings indicating that IBM would be unlikely to tie the sale of its computers with mandatory maintenance agreements. This conclusion was effectively

a determination that the third element of the test set forth in *Eastman Kodak* had not been satisfied. Where an antitrust plaintiff pleads a claim asserting a *past* act of illegal tying, the third element of *Eastman Kodak* requires a showing that the defendant has actually tied the two products. On the other hand, in adjudicating a motion to terminate an existing consent decree, the district court cannot ordinarily decide the third element merely by reference to whether the defendant is now engaging in, or has ever engaged in, actual tying. Indeed, the very existence of the consent decree will normally prevent actual tying. The appropriate analysis under the circumstances is necessarily forward-looking and probabalistic: for purposes of the third factor of *Eastman Kodak*, the court should ask how likely it is that the defendant will thereafter engage in the actual tying of the relevant products following termination of the Decree. We read the district court's ruling as having squarely decided that such future tying was unlikely—a finding that is not disputed here.

ISNI offers two further challenges to the district court's reasoning. First, ISNI contends—without citation to supporting legal authority—that the Decree should not be terminated unless IBM no longer has the *ability* to achieve an illegal tying. We disagree. Under *American Cyanamid,* courts examine the elements of the relevant species of antitrust violation (here, the illegal tying arrangement) in order, ultimately, to determine whether termination will be in the "public interest." Although IBM's competitors (including the firms that constitute ISNI) may prefer that the Decree remain in effect to protect them from the unlikely event of illegal tying by IBM, the public does not share this interest. As reflected in the *Eastman Kodak* test, which requires both appreciable market power (element four) and *actual* tying (element three), the Sherman Act is not designed to curb all concentrations of economic power that could theoretically be used to restrain trade, but only those that will actually be used to do so. As the Supreme Court has explained, "The purpose of the [Sherman] Act is *not* to protect businesses from the working of the market; it is to protect the public from the failure of the

market." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). At least under the circumstances presented here—where the government has joined the antitrust defendant's motion to terminate a consent decree—the district court properly focused on the likelihood of a potential future violation, rather than the mere possibility of a violation.

Finally, ISNI challenges the legal analysis underlying the district court's projection that competitive forces in the market for business computers would serve to deter IBM from cutting off the supply of spare parts. In particular, ISNI urges that the district court failed to conduct the thorough analysis of market competition required by *Eastman Kodak.* In that case, the Supreme Court noted that "[t]he extent to which one market *prevents* exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.,* the 'cross-elasticity of demand.'" *Eastman Kodak,* 504 U.S. at 469, 112 S.Ct. 2072 (emphasis added) (citations omitted). Accordingly, the Court rejected Kodak's argument—under the fourth element of the test—that competition in the market for photocopying machines would *necessarily* make it impossible to exert market power over the parts market. The Court explained that further evidence would need to be developed on (1) the costs Kodak's present customers would incur in switching to another brand, and (2) the ability of Kodak's potential customers to make accurate assessments of maintenance costs when choosing brands. *See id.* at 473–78, 112 S.Ct. 2072.

ISNI asserts that the evidence uncovered by the Government in the course of its investigation shows that current owners of S/390 and AS/400 machines are locked into their present systems. In particular, it argues that current users of those computer systems have invested over $1 trillion in software that is, for the most part, incompatible with machines produced by IBM's competitors. Additionally, ISNI argues that because it is impossible to know how soon technological advances will make the S/390 and AS/400 systems obsolete, potential customers will not be able to make accurate predictions of the lifetime costs of maintenance.

Quite apart from whether ISNI's arguments are convincing on their own terms, they misunderstand the reason why the Court in *Eastman Kodak* entertained these questions at all. The *Eastman Kodak* Court examined these questions only in evaluating Kodak's argument that the plaintiffs could not prove the fourth element in a tying case—"appreciable economic power in the tying market." By contrast, the district court in the instant case did not look to market dynamics to question whether IBM had the sort of market power that would *allow* it to lock customers into a given product, but whether IBM was likely to do so (the third element). Whether or not IBM has substantial market power over the business computer market, the district court had sufficient evidence before it to determine that IBM is unlikely to use any such market power to effect an illegal tying arrangement.

## IV.

For the foregoing reasons, we affirm the district court's May 1, 1997 order terminating the Decree.