**UNITED STATES of America,**
**Plaintiff,**

v.

**KEYSPAN CORPORATION,**
**Defendant.**

**No. 10 Civ. 1415(WHP).**

United States District Court,
S.D. New York.

Feb. 2, 2011.

Molly S. Boast (argued), Donna N. Kooperstein, Jade Alice Eaton, J. Richard Doidge, John W. Elias, William H. Stallings, U.S. Department of Justice, Antitrust Division, Washington, D.C., for Plaintiff.

John H. Lyons, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, for Defendant.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiff United States of America (the "United States" or "Government") moves pursuant to § 2(b) of the Antitrust Procedures and Penalties Act (the "Tunney Act"), 15 U.S.C. § 16(b)-(h) for entry of a final judgment (the "Consent Decree") settling its antitrust claims against Defendant Keyspan Corporation ("Keyspan"). This application presents a novel issue of law: whether the Department of Justice can seek disgorgement for a Sherman Act violation. This Court answers that question in the affirmative. For the following reasons, the Government's motion for entry of the Consent Decree is granted.

## BACKGROUND

The Complaint alleges that Keyspan, an electricity generator, manipulated New York City electricity prices using a swap agreement (the "Swap") in violation of § 1 of the Sherman Act. (Compl. ¶ 37.) Specifically, the Swap provided Keyspan with an indirect financial interest in the sale of electricity generating capacity by its largest competitor, Astoria Generating Company ("Astoria"). That financial interest obviated Keyspan's need to bid competitively during the sale of its own electricity generating capacity at auction. (Compl. ¶¶ 4–5, 30.) According to the Complaint, Keyspan's anticompetitive bidding drove up capacity prices as a whole and, in turn, increased the cost of electricity to consumers in New York City. (Compl. Preamble, ¶¶ 4–5, 30.)

## I. The New York City Electricity Market From May 2003 to March 2008

The New York Independent System Operator ("NYISO") regulates the sale of electricity in New York City by companies that generate electricity ("generators") to companies retailing electricity to consumers ("retailers"). (See Compl. ¶¶ 12–14, 17.) The NYISO requires retailers to purchase a product known as "installed capacity" from generators. (Compl. ¶¶ 12–14.) The price of installed capacity is established through seasonal, monthly, and spot auctions administered by the NYISO. (Compl. ¶ 14; Competitive Impact Statement ("CIS") dated Feb. 22, 2010 at 3.) During those auctions, generators offer capacity by submitting price and quantity "bids," which are then "stacked" from lowest- to highest-priced and compared to demand from retailers. (Compl. ¶ 14; CIS at 3.) The offering price of the last bid required to meet demand establishes the market price for all installed capacity sold in that auction (the "Clearing Price"). (Compl. ¶ 15.) Any capacity bid at a higher price is unsold, as is any capacity bid at the Clearing Price in excess of demand. (Compl. ¶ 15.)

The New York City electricity market is highly concentrated, with three generators—Keyspan, NRG Energy, Inc., and Astoria—"controlling a substantial portion of generating capacity...." (Compl. ¶ 17.) Accordingly, from 2003 to 2008, Keyspan possessed market power in the New York City capacity market. (Compl. ¶ 18.) As

major electricity generators, the three firms were designated by the Federal Energy Regulatory Commission as "pivotal suppliers," meaning a portion of each firm's output was vital to satisfy capacity demand. (CIS at 4.) The firms were also required to sell their capacity through NYISO's auctions and were subject to bid and price caps. (CIS at 4.) Keyspan had the highest bid and price cap of the three firms. (CIS at 4.)

## II. *Keyspan's Anticompetitive Conduct*

From June 2003 to December 2005, demand for installed capacity was high. (CIS at 4.) As a result, Keyspan was able to sell nearly all of its installed capacity, even while offering it at the highest possible price, i.e., "bidding its cap." (CIS at 4.) However, tight supply and demand conditions were expected to end in 2006 with the planned entry of additional capacity.[1] Accordingly, Keyspan anticipated that bidding its cap would be less profitable and began investigating options for preserving its profit margins. (CIS at 4–5.)

While Keyspan initially considered purchasing Astoria's assets, it concluded that such an acquisition would raise market power concerns. (CIS at 5.) Instead, Keyspan decided to acquire an indirect financial interest in Astoria's capacity sales. (CIS at 5.) On January 18, 2006, Keyspan entered into the Swap with a financial services company (the "Bank"). (CIS at 6.) The parties' obligations under the Swap were price dependent. If the Clearing Price was above $7.57 per kW-month, the Bank was required to pay Keyspan a multiple of the difference between those two prices. (CIS at 6.) In contrast, if the Clearing Price was below $7.57, Keyspan was required to pay the

Bank a multiple of the difference. (CIS at 6.)

According to the Complaint, Keyspan recognized that (i) the Bank would have to enter into a separate swap agreement with another generator to offset its payments to Keyspan and (ii) Astoria was the only generator with sufficient capacity to do so. (CIS at 5.) As expected, the Bank conditioned the Swap on the execution of a suitable offsetting agreement. On January 9, 2006, the Bank entered into an offsetting swap with Astoria. (CIS at 6.)

The Complaint alleges that the Swap eliminated Keyspan's incentive to pursue competitive bidding strategies by allowing it to continue to bid its cap, even though much of its capacity was unsold. (Compl. ¶¶ 31–32.). Absent the Swap, Keyspan would have bid its capacity at lower prices in response to the entry of additional capacity into the market, thereby causing capacity prices to decline. (Compl. ¶ 22, 31–34.)

The anticompetitive effects of the Swap continued until March 2008. (CIS at 7 n. 2.) Keyspan was sold in August 2007 and New York conditioned its approval of the sale on Keyspan bidding its New York City capacity at zero from March 2008 until the divestiture was completed. (CIS 7 n. 2). According to the Government, from May 2006 to April 2008, Keyspan earned approximately $49 million in net revenues under the Swap. (Pl. United States's Resp. to Public Comments ("Gov't Resp.") dated June 11, 2010 at 6; Declaration of Oliver M. Richard ("Richard Decl.") dated Oct. 26, 2010, ECF No. 37.)

## III. *The Consent Decree & Tunney Act Requirements*

The Consent Decree requires Keyspan to pay $12 million to the United States

---

1. Supply conditions were expected to tighten again in 2009 with the retirement of old generation units and growth in demand. (CIS at 4.)

Treasury and imposes no further obligations. Pursuant to the requirements of the Tunney Act, the Government filed a Competitive Impact Statement ("CIS") on February 23, 2010; published the proposed Consent Decree and the CIS in the Federal Register on March 4, 2010; and published summaries of those documents and directions for the submission of written comments in *The Washington Post* and in *The New York Post.* The 60–day period for public comments ended on May 16, 2010. Six entities and one individual commented on the Consent Decree. (Gov't Resp. at 2.)

On June 11, 2010, the Government filed its Response to Public Comments. On July 20, 2010, the Government moved for entry of the Consent Decree. On August 12, 2010, this Court permitted the Public Service Commission of the State of New York ("PSCNY") to file a reply to the Government's Response to Public Comments. On October 12, 2010, this Court held a hearing (the "October Hearing"), posed questions to the parties, and directed the Government to provide a declaration concerning its calculations of Keyspan's net revenues under the Swap. On October 26, 2010, the Government submitted the declaration of Oliver M. Richard, Assistant Chief in the Economic Litigation Section of the Antitrust Division of the Department of Justice, which described those calculations.

## DISCUSSION

### I. *Legal Standard*

■ The Tunney Act requires a court reviewing an antitrust consent decree to determine whether the decree is "in the public interest." 15 U.S.C. § 16(e)(1); *see also United States v. Int'l Bus. Mach. Corp.,* 163 F.3d 737, 740 (2d Cir.1998). The statute does not define the meaning of

"in the public interest," but directs a court to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1).

■ "While the Tunney Act was designed to prevent 'judicial rubber stamping' of proposed Government consent decrees, the Court's role in making the public interest determination is nonetheless limited. The Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will *best* serve society, but only to ensure that the resulting settlement is 'within the *reaches* of the public interest.'" *United States v. Alex. Brown & Sons, Inc.,* 963 F.Supp. 235, 238 (S.D.N.Y.1997) (quoting *United States v. Microsoft Corp.,* 56 F.3d 1448, 1460 (D.C.Cir.1995)). In making this determination, "[t]he [c]ourt is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable. [Rather], the relevant inquiry is whether there is a factual foundation for the government's deci-

sions such that its conclusions regarding the proposed settlement are reasonable." *United States v. Abitibi–Consolidated Inc.,* 584 F.Supp.2d 162, 165 (D.D.C. 2008); *see also Massachusetts v. Microsoft Corp.,* 373 F.3d 1199, 1236 (D.C.Cir. 2004) ("Under the Tunney Act, the district court's 'public interest' inquiry into the merits of the consent decree is a narrow one...."). A court must limit its review to the issues in the complaint and give "due respect to the [government's] perception of ... its case...." *Microsoft,* 56 F.3d at 1459–60; *see also United States v. Bleznak,* 153 F.3d 16, 20 (2d Cir.1998) ("The range of materials that are 'determinative' under the Tunney Act is fairly narrow."). "A court may, in its discretion, invoke additional procedures when it determines such proceedings may assist in the resolution of issues raised by the comments." *United States v. Enova Corp.,* 107 F.Supp.2d 10, 17 (D.D.C.2000).

## II. *Analysis*

### a. *Availability of Disgorgement*

The Government submits that it has never pursued disgorgement as a remedy for a Sherman Act violation,[2] but contends that disgorgement of Keyspan's revenues will best remedy its anticompetitive conduct.

 Disgorgement is an equitable, as opposed to legal, remedy derived from the court's equity powers. "The primary purpose of disgorgement is not to compensate [victims] ... [but rather to] forc[e] a defendant to give up the amount by which he was unjustly enriched. The emphasis on public protection, as opposed to simple compensatory relief, illustrates the equita-

ble nature of the remedy." *Sec. & Exchange Comm'n v. Cavanagh,* 445 F.3d 105, 119 (2d Cir.2006). There are no decisions concerning a district court's power to order disgorgement to remedy a Sherman Act violation. However, because the Court of Appeals squarely addressed whether disgorgement is available to remedy violations of the securities laws, this Court begins there.

In *Cavanagh,* the Court of Appeals upheld the equitable disgorgement of profits earned from an illegal "pump and dump" scheme. 445 F.3d at 109–10, 119–20. The Court of Appeals held that a district court's power to compel disgorgement turns on whether the "remedy survives the Supreme Court's teachings in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.* ... [regarding] the proper scope of equitable remedies in the federal courts." *Cavanagh,* 445 F.3d at 116–17. In *Grupo Mexicano,* the Supreme Court held that the equity jurisdiction of the federal courts derives from the Judiciary Act of 1789 and therefore is the same as "the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act...." 527 U.S. 308, 318, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) (quotations omitted). Accordingly, in *Cavanagh,* the Court of Appeals held that the question of "whether the [d]istrict [c]ourt acted beyond its equitable powers requires an inquiry into whether the remedies available at chancery in 1789 included disgorgement...." *Cavanagh,* 445 F.3d at 118.

The Court of Appeals examined this question at length and found, *inter alia,* that (1) "[c]ommentators have observed

---

**2.** On rare occasions, the Department of Justice has sought disgorgement of profits in contempt actions for violation of a consent decree. (*See, e.g.,* Proposed Settlement Agreement & Order filed Nov. 26, 2007, *United States v. Cal Dive Int'l Inc., et ano.,* 05 Civ. 2041 (D.D.C), ECF No. 31.)

that courts of equity now have, and have had for centuries, jurisdiction over claims arising from improper acquisition of assets;" (2) "[e]arly writings on equity recognized the Chancellor's power to compel disgorgement of wrongly gained assets;" (3) "English equity courts compelled the repayment (in effect, 'disgorgement') of ill-gotten gains in cases decided before our independence;" and (4) "American courts also awarded equitable remedies similar to modern disgorgement in cases decided around the time of our nation's founding." *Cavanagh*, 445 F.3d at 118–20. Thus, "[b]ecause chancery courts possessed the power to order equitable disgorgement in the eighteenth century, . . . contemporary federal courts are vested with the same authority by the Constitution and the Judiciary Act." *Cavanagh*, 445 F.3d at 120.[3] In view of this holding, it is clear that the limitations articulated in *Grupo Mexicano* do not prohibit disgorgement of Keyspan's revenues under the Swap because it was available at the time of the Judiciary Act. *Cavanagh*, 445 F.3d at 118–20.[4]

However, *Cavanagh* does not end the analysis because limitations may still exist under traditional equity and antitrust principles. As to equity jurisdiction, "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *see Mitchell v. Robert DeMario Jewelry. Inc.*, 361 U.S. 288, 291, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) (" 'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.' " (quoting *Porter*, 328 U.S. at 398, 66 S.Ct. 1086)); *Fed. Trade Comm'n v. Mylan Labs., Inc.*, 62 F.Supp.2d 25, 37 (D.D.C.1999) ("The comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command." (quoting *Porter*, 328 U.S. at 398, 66 S.Ct. 1086)). Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 4 invests a district court with "jurisdiction to prevent and restrain" § 1 violations, and charges "the Attorney General[ ] [with the duty] to institute proceedings *in equity* to prevent and restrain such violations." 15 U.S.C. § 4 (emphasis added). These provisions are broad and contain no language divest-

---

**3.** Some courts have recognized limitations on *Grupo Mexicano*'s scope. *See, e.g., United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir.1999) (*Grupo Mexicano*'s holding limited to actions at law because it did not involve "a situation in which equitable remedies were claimed"); *see also In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir.2004) ("*Grupo Mexicano* does not prohibit a preliminary injunction in this case. [Plaintiff] has pleaded a cause of action for fraudulent conveyance, and . . . for constructive trust, which is equitable in nature."); *Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*, 144 F.Supp.2d 241, 250 (S.D.N.Y.2001) ("[C]ourts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief . . ., a court retains its equitable power to freeze assets."). However, *Cavanagh* is silent on these limitations and appears to accept *Grupo Mexicano*'s applicability to any exercise of a federal court's equity powers. This Court need not examine this issue further because an analysis under traditional equity and antitrust principles is required.

**4.** To the extent that disgorgement of wrongly obtained assets due to securities fraud differs from the relief sought here—i.e., disgorgement of revenues earned under a lawful agreement executed for the purpose of restraining trade—*Cavanagh*'s analysis is broad and applies with equal force in the antitrust context.

ing a court of its "inherent equitable powers." *See Porter*, 328 U.S. at 398, 66 S.Ct. 1086.

■ Moreover, disgorgement comports with established principles of antitrust law. When fashioning a consent decree in an antitrust action, district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case." *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 253, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) (quotations omitted). A consent decree should, among other things, "deprive the antitrust defendants of the benefits of their conspiracy." *Int'l Boxing Club*, 358 U.S. at 253, 79 S.Ct. 245 (quotations omitted); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 577, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) ("[A]dequate relief in a monopolization case should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct . . . ."); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 368, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961) ("Those who violate the Act may not reap the benefits of their violations . . . ." (quotations omitted)). Disgorgement accomplishes that goal. In fact, there appears to be little disagreement among commentators about the propriety of disgorgement as an antitrust remedy. *See* Phillip E. Areeda et al., *Antitrust Law* ¶ 325a (3d ed. 2007) ("[E]quity relief may include, where appropriate, the disgorgement of improperly obtained gains."); Einer Elhauge, *Disgorgement as an Antitrust Remedy*, 76 Antitrust L.J. 79, 79 (2009) ("One's first reaction might well be that perhaps the rare usage reflects some underlying insecurity about whether disgorgement really is a permissible antitrust remedy. But there is surprisingly little doubt that equitable antitrust remedies include requiring

violators to disgorge any illegally obtained profits.").

■ Disgorgement is particularly appropriate where, as here, the anticompetitive conduct in question has ceased. As discussed below, this Court defers to the Government's conclusion that restitution—i.e., making New York City consumers whole—is likely unavailable. Further, the Swap has expired and, unlike many other antitrust actions, there are no assets to be divested. Thus, "the exigencies of [this] case" are that, absent disgorgement, the Government is without recourse to remedy Keyspan's anticompetitive conduct. *Int'l Boxing Club*, 358 U.S. at 253, 79 S.Ct. 245; *accord Ford Motor Co. v. United States*, 405 U.S. 562, 573, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972) ("The District Court is clothed with large discretion to fit the decree to the special needs of the individual case." (quotations omitted)). A rejection of disgorgement could incentivize other generators to manipulate the electricity markets using derivative instruments that expire in the short term, with the understanding that they will be permitted to retain their earnings because restitution for consumers is unavailable. Accordingly, given a sufficient factual undergirding for the Government's calculations, this Court has the power to order disgorgement of Keyspan's revenues.

This Court notes that the Second Circuit and D.C. Circuit have interpreted similar language under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and found that disgorgement is either limited or unavailable as a remedy for a RICO violation. Section 1964 of RICO provides that:

[t]he district courts of the United States shall have jurisdiction to prevent and restrain [RICO] violations . . . including, but not limited to: ordering any person to divest himself of any interest, direct

or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

18 U.S.C. § 1964. The D.C. Circuit held that "[t]his language indicates that [RICO] jurisdiction is limited to forward-looking remedies that are aimed at future violations" and that disgorgement "is a quintessentially backward-looking remedy focused on remedying the effects of past conduct to restore the status quo." *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1198 (D.C.Cir.2005). The Second Circuit adopted a less restrictive approach, holding that disgorgement is available to remedy a RICO violation only if its purpose is forward-looking. *See United States v. Carson*, 52 F.3d 1173, 1182 (2d Cir.1995) ("Ordinarily, the disgorgement of gains ill-gotten long in the past will not serve the goal of preventing and restraining future violations unless there is a finding that the gains are being used to fund or promote the illegal conduct, or constitute capital available for that purpose." (internal quotations omitted)).

These decisions are not controlling. First, the Sherman Act does not contain the same limiting provisions found in RICO. *See United States v. Lane Labs–USA Inc.*, 427 F.3d 219, 233 (3d Cir.2005) (distinguishing RICO from the Federal Food, Drug and Cosmetic Act because the latter "gives blanket authority to district courts to restrain violations" whereas RICO "listed several specific types of re-

lief aimed at [preventing] . . . future violations"). Moreover, *Philip Morris* and *Carson* do not evaluate disgorgement in the antitrust context.[5] Antitrust law is both forward- *and* backward-looking. *See Int'l Boxing Club*, 358 U.S. at 252, 79 S.Ct. 245 ("The decree should (1) put an end to the combination or conspiracy when that is itself the violation; (2) deprive the antitrust defendants of the benefits of their conspiracy; and (3) break up or render impotent the monopoly power which violates the Act" (quotations omitted)). Accordingly, disgorgement is available to remedy a Sherman Act violation.

b. *Whether the Settlement is in the Public Interest*

■ Public comments on the CIS leveled three principal objections to the Consent Decree: (1) the Government provided an insufficient factual basis for its calculation of the net revenues earned by Keyspan under the Swap; (2) $12 million in disgorgement is inadequate because it is neither commensurate with Keyspan's enrichment under the Swap nor sufficient to deter future anticompetitive conduct; and (3) the settlement proceeds should be returned to New York City electricity customers, not the United States Treasury. (Gov't Resp. at 9–12.)

As to the factual basis for the Government's revenue calculation, at the Court's request, the Government submitted the declaration of Dr. Oliver M. Richard, an economist responsible for supervising analyses performed by Department of Justice staff economists. In his declaration, Richard outlines the formulas set forth in the Swap for determining the parties' respective payment obligations, applies those formulas to the market prices established in

---

**5.** *Carson* is also distinguishable because the plaintiff sought disgorgement of funds earned long in the past, more than eight years prior to the filing of the action. 52 F.3d at 1182.

the relevant electricity capacity auctions, and provides a month-by-month breakdown of payments made by Keyspan and the Bank under the Swap. (Richard Decl. at 2–3.) Based on that analysis, Richard concluded that Keyspan earned net revenues of $48,960,000. Notably, the PSCNY—which initially objected to the lack of support for the Government's calculations—"now concurs in the determination of Keyspan's net Swap revenues." (United States's Submission of Decl. of Oliver M. Richard in Supp. of Its Mot. To Enter Final J.) This Court has no reason to question the Government's calculations. *See Abitibi–Consolidated*, 584 F.Supp.2d at 165–66 (relying on the declaration of a Department of Justice economist in ordering divestiture); *United States v. SBC Commc'ns, Inc.*, 489 F.Supp.2d 1, 19–24 (D.D.C.2007) (same). Thus, the Government's revenue calculations are adequately supported by the record.

■ The adequacy of the disgorgement amount must be evaluated in view of the Government's decision to settle its claims and seek entry of the Consent Decree. When a litigant chooses to forgo discovery and a trial in favor of settlement, full damages cannot be expected. *See In re Linerboard Antitrust Litig.*, 321 F.Supp.2d 619, 633 (E.D.Pa.2004) (compiling decisions approving settlements for a fraction of the total damages sought); *see also In re Milken and Assocs. Sec. Litig.*, 150 F.R.D. 46, 54 (S.D.N.Y.1993) (Pollack, J.) ("[T]he Second Circuit has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought."). The issues raised in the Complaint are complex and discovery would have been extensive. Thus, the Government is entitled to deference in choosing to pursue settlement in this action. *See Alex. Brown*, 963 F.Supp. at 239.

Moreover, public comments calling for a disgorgement figure commensurate with the losses suffered by New York City consumers fail to comprehend the nature of the disgorgement remedy. "The primary purpose of disgorgement is not to compensate investors," but rather to divest a wrongdoer of the proceeds of their misconduct. *Cavanagh*, 445 F.3d at 117. Thus, while the ultimate effect of the Swap may have been increased prices to retailers and, in turn, to consumers, the benefit to Keyspan was the Swap revenues and less risk at auction. According to the Government, Keyspan did not necessarily earn additional revenues by bidding its cap at auction—rather, absent the Swap, Keyspan's competitive bidding could have earned the company greater revenues from the sale of increased volume. (October Hearing at 8–9.) With these considerations in mind, disgorgement of $12 million is reasonable. Any other determination would be speculative and ignore the Government's theory of the case. *See Microsoft*, 56 F.3d at 1459–60 (a court must give "due respect to the [government's] perception of . . . its case")

$12 million in disgorgement is also an adequate deterrent. It represents 25% of Keyspan's net revenues under the Swap. Moreover, disgorgement for a Sherman Act violation was never judicially sanctioned prior to this action. Future manipulators of electricity markets or those who seek to leverage derivative products in the restraint of trade now face the prospect of disgorgement in addition to other remedies. This case is an important marker for enforcement agencies and utility regulators alike. Approving disgorgement as part of the Government's arsenal tilts incentives back in favor of competitive bidding and deters the use of derivatives as tools to manipulate a market.

Finally, this Court rejects the notion that the Consent Decree should only be approved if the disgorged proceeds are returned to New York City consumers. While such relief might be optimal, payment of the disgorged proceeds to the Treasury is nevertheless "within the *reaches* of the public interest." *Alex. Brown*, 963 F.Supp. at 238 (quotations omitted). It can be effectuated without incurring transaction costs and inures to the public benefit. *See Sec. & Exchange Comm'n v. Bear, Stearns & Co. Inc.*, 626 F.Supp.2d 402, 419 (S.D.N.Y.2009) (answering "the question of how [disgorged money] can be used to do 'the greatest good for the greatest number of people'" by ordering its transfer to the "Treasury to be used by the Government for its operations").

Moreover, the Government raises valid concerns regarding potential violation of the filed-rate doctrine.

"The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable. Simply stated, the doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers."

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18–19 (2d Cir.1994); *see also Keogh v. Chi. & Northwestern Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (holding that the filed rate doctrine bars recovery for antitrust damages against carriers colluding to set artificially high shipment rates). In view of that prohibition, return of the disgorged proceeds to New York City electricity customers could circumvent the filed-rate doctrine. A court must extend "deference to the Government's evaluation of the case and the remedies

available to it." *Alex. Brown*, 963 F.Supp. at 239.

## CONCLUSION

For the foregoing reasons, the Government's motion for entry of the final judgment is granted. The Clerk of the Court is directed to terminate the motions pending at Docket Nos. 25 and 27.

SO ORDERED.