**UNITED STATES of America, Plaintiff,**

v.

**MORGAN STANLEY, Defendant.**

**No. 11 Civ. 6875 (WHP).**

United States District Court, S.D. New York.

Aug. 7, 2012.

---

William H. Stallings (argued), Jade Alice Eaton, J. Richard Doidge, John W. Elias, U.S. Department of Justice Antitrust Division, Washington, DC, for Plaintiff.

Jon Randall Roellke, Bingham McCutchen, LLP (DC), Washington, DC, for Defendant.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge.

Plaintiff United States of America (the "Government") moves pursuant to section 2(b) of the Antitrust Procedures and Penalties Act (the "Tunney Act"), 15 U.S.C. § 16(b)-(h), for entry of a final judgment (the "Consent Decree") settling its antitrust claim against Defendant Morgan Stanley. The Government represents that this case is its first attempt to obtain disgorgement from a financial services firm that used derivative agreements to facilitate anticompetitive behavior. For the following reasons, the Government's motion for entry of the Consent Decree is granted.

## BACKGROUND

The Complaint alleges that Morgan Stanley violated section 1 of the Sherman Act, 15 U.S.C. § 1, by facilitating KeySpan Corporation's ("KeySpan") acquisition of a financial interest in its largest competitor, Astoria Generating Company Acquisitions, L.L.C. ("Astoria"). (Complaint dated Sept. 30, 2011 ("Compl.") ¶¶ 4, 38.) Both KeySpan and Astoria are electricity generators operating in New York City.

The Government alleges that Morgan Stanley aided KeySpan's efforts to manipulate electricity prices through a swap agreement. (Compl. ¶ 31.) The swap agreement effectively gave KeySpan a right to revenue Astoria earned at auction when the market price for electricity generating capacity exceeded a certain price. (Compl. ¶¶ 23, 26.) As a consequence, the agreement obviated the need for KeySpan to bid competitively during the sale of its own electricity generating capacity to electricity retailers, thereby driving capacity prices up and increasing the cost of electricity to consumers. (Compl. at 1–2, ¶¶ 30–34.) "Absent the [s]wap, Key[S]pan would have bid its capacity at lower prices in response to the entry of additional capacity into the market, thereby causing capacity prices to decline." *United States v. Keyspan Corp.,* 763 F.Supp.2d 633, 636 (S.D.N.Y.2011).

Morgan Stanley engineered this arrangement by serving as the counterparty

to two agreements—the swap with KeySpan and a hedge with Astoria—that remained in effect from May 2006 through April 2009. (Compl. ¶¶ 25–29.) Under the swap agreement, if the market price for capacity exceeded $7.57 per kW-month, Morgan Stanley would pay KeySpan the difference between the market price and $7.57 times 1800 megawatts ("MW"); if the market price fell below $7.57, KeySpan would pay Morgan Stanley the difference times 1800 MW. (Compl. ¶ 26.) Under the hedge, if the market price rose above $7.07 per kW-month, Astoria would pay Morgan Stanley the difference times 1800 MW; if the market price dipped below $7.07, Morgan Stanley would pay Astoria the difference times 1800 MW. (Compl. ¶ 28.) Morgan Stanley allegedly earned approximately $21.6 million in net revenues while serving as the counterparty to KeySpan and Astoria. (Compl. ¶ 35.)

The Government sued KeySpan for its part in the swap agreement on February 22, 2010. On February 2, 2011, this Court approved the parties' settlement. *See Keyspan,* 763 F.Supp.2d at 638–43. In so doing, this Court rejected public comments that the settlement amount was inadequate and that the proceeds should be remitted to New York City electricity consumers. *See Keyspan,* 763 F.Supp.2d at 641–43.

The Consent Decree here requires Morgan Stanley to disgorge to the United States Treasury $4.8 million in net revenues it earned from these transactions. Pursuant to the requirements of the Tunney Act, 15 U.S.C. § 16(b)-(c), the Government filed a Competitive Impact Statement ("CIS") on September 30, 2011 (ECF No. 2), published the proposed Consent Decree and CIS in the Federal Register on October 11, 2011, and published summaries of those documents and directions for the submission of written comments in *The Washington Times* and *The New York Post.* The sixty-day period for public com-

ments ended on December 30, 2011. The Government received formal comments objecting to the Consent Decree from the Public Service Commission of the State of New York (the "PSC") and from AARP, a nonprofit organization dedicated to assisting people over the age of fifty (together, the "public commenters"). (ECF No. 10, attach. 1, 2.) On January 13, 2012, State Senator Michael Gianaris and New York City Councilman Peter Vallone sent a letter to the Court urging rejection of the Consent Decree. (ECF No. 9). Their letter reiterates the objections of the PSC and AARP.

The public comments level three principal complaints against the Consent Decree: (1) that $4.8 million in disgorgement is inadequate to deter future misconduct, particularly given the magnitude of the injury to New York City electricity consumers; (2) that Morgan Stanley has not admitted any wrongdoing; and (3) that the disgorged money should be returned to New York City electricity customers, and not remitted to the U.S. Treasury.

## DISCUSSION

### I. *Legal Standard*

The Tunney Act requires a court reviewing an antitrust consent decree to determine whether the decree is "in the public interest." 15 U.S.C. § 16(e)(1); *see also United States v. Int'l Bus. Mach. Corp.,* 163 F.3d 737, 740 (2d Cir.1998). The statute does not define the meaning of "in the public interest," but directs courts to consider:

(A) the competitive impact of such judgment, including termination of *alleged violations,* provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competi-

tive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial,

15 U.S.C. § 16(e)(1) (emphasis added).

 "While the Tunney Act was designed to prevent 'judicial rubber stamping' of proposed Government consent decrees, the Court's role in making the public interest determination is nonetheless limited. The Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will *best* serve society, but only to ensure that the resulting settlement is 'within the *reaches* of the public interest.' " *United States v. Alex. Brown & Sons,* 963 F.Supp. 235, 238 (S.D.N.Y.1997) (quoting *United States v. Microsoft Corp.,* 56 F.3d 1448, 1460 (D.C.Cir.1995)) (citation omitted). In making this determination, "[t]he Court is not permitted to reject the proposed remedies merely because the [C]ourt believes other remedies are preferable. [Rather], the relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable." *United States v. Abitibi–Consol. Inc.,* 584 F.Supp.2d 162, 165 (D.D.C.2008) (citation omitted) (internal quotation marks omitted); *see also Massachusetts v. Microsoft Corp.,* 373 F.3d 1199, 1236 (D.C.Cir.2004) ("Under the Tunney Act, the district court's 'public interest' inqui-

ry into the merits of the consent decree is a narrow one[.]"). A court must limit its review to the issues in the complaint and give "due respect to the [Government's] perception of . . . its case[.]" *Microsoft,* 56 F.3d at 1461; *see also United States v. Bleznak,* 153 F.3d 16, 20 (2d Cir.1998) ("The range of materials that are 'determinative' under the Tunney Act is fairly narrow."). In general, the "scope of a court's authority to second-guess an agency's discretionary and policy-based decision to settle is at best minimal." *SEC v. Citigroup Global Mkts. Inc.,* 673 F.3d 158, 164 (2d Cir.2012) (per curiam).

## II. *Adequacy of the Disgorgement Amount*

 Disgorgement of $4.8 million is an adequate remedy within the reaches of the public interest. The amount constitutes approximately 22% of Morgan Stanley's net revenues from the transactions, a disgorgement percentage slightly less than that approved by this Court in *Keyspan. See* 763 F.Supp.2d at 642 (approving disgorgement of approximately 25% of net revenues because "[t]he adequacy of the disgorgement amount must be evaluated in view of the Government's decision to settle its claims and seek entry of the [c]onsent [d]ecree. When a litigant chooses to forgo discovery and a trial in favor of settlement, full damages cannot be expected."). According to the Government, this case represents its first attempt to obtain disgorgement from a financial services firm that used derivative agreements to facilitate anticompetitive behavior. Approving disgorgement here likely will deter financial services firms from offering derivatives that facilitate anticompetitive behavior to clients. (CIS at 8–9.) The innovative application of the disgorgement remedy in this action suggests that the

settlement will have meaningful deterrent effects.

The public commenters argue that disgorgement of $4.8 million is inadequate in view of the $21.6 million Morgan Stanley earned in net revenues and the increased prices paid by electricity consumers. They contend that the Government should not have settled the case without receiving the full $21.6 million that Morgan Stanley received, and that Morgan Stanley's damages should reflect the full harm suffered by ratepayers. This Court shares these concerns.

Given the Government's stark allegations of manipulative conduct against Morgan Stanley, disgorgement of $4.8 million is a relatively mild sanction. There is a risk that a large financial services firm like Morgan Stanley could view such a modest penalty as merely a cost of doing business. But despite this Court's misgivings, the Government's decision to settle for less than full damages is entitled to judicial deference, particularly in view of the novelty of the Government's theory. *See Citigroup*, 673 F.3d at 163–64. At this stage of the lawsuit, the Government has not proved its case, and Morgan Stanley could assert potentially meritorious defenses if the litigation proceeded. Moreover, as the Second Circuit recently observed:

> The numerous factors that affect a litigant's decision whether to compromise a case or litigate it to the end include the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt. In the case of a public executive agency … the factors include also an assessment of how the public interest is best served. These are precisely the factors that the Supreme Court has recognized as making a discretionary agency decision unsuitable for judicial review.

*Citigroup*, 673 F.3d at 164.

Further, this Court will not second-guess the wisdom of the Government's decision to pursue a disgorgement remedy rather than restitution. *See Citigroup*, 673 F.3d at 163–64 (quoting *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The argument for disgorgement in an amount commensurate with the losses suffered by New York City electricity consumers misapprehends the nature of the disgorgement remedy: "[T]he primary purpose of disgorgement is not to compensate investors," but rather to divest a wrongdoer of the proceeds of its misconduct. *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir.2006) (alteration in original). Accordingly, it was reasonable for the Government to key the disgorgement amount to Morgan Stanley's net revenues rather than to alleged consumer harm.

### III. *No Admission of Liability*

AARP argues that the Consent Decree should be rejected because Morgan Stanley does not admit wrongdoing. But the Clayton Act and the Tunney Act do not require an admission of wrongdoing as a prerequisite to judicial approval of the Consent Decree. While litigated final judgments establishing a violation constitute "prima facie evidence" that may be used against the defendant in private litigation, the Clayton Act provides an exception for consent decrees: "[C]onsent judgments or decrees entered before any testimony has been taken" cannot be used against a defendant in private litigation. 15 U.S.C. § 16(a). This exception "encourage[s] defendants to settle promptly" without admitting wrongdoing. *United States v. Nat'l Ass'n of Broadcasters*, 553 F.Supp. 621, 623 (D.D.C.1982); *see also*

*Citigroup,* 673 F.3d at 165 ("Requiring ... admission [of wrongdoing] would in most cases undermine any chance for compromise."); *Alex. Brown & Sons,* 963 F.Supp. at 238–39 ("In enacting the Tunney Act, Congress recognized the high rate of settlement in public antitrust cases and wished to encourage[ ] settlement by consent decrees as part of the legal policies expressed in the antitrust laws." (alteration in original) (internal quotation marks omitted)). Further, the repeated references to the term "alleged violation" in the Tunney Act suggest that Congress never intended for consent decrees to contain admissions of wrongdoing. Indeed, the Tunney Act contains no reference to admissions or findings of violations.

AARP relies chiefly on the district court opinion in *SEC v. Citigroup Global Markets Inc.,* 827 F.Supp.2d 328, 333 (S.D.N.Y.2011), for the proposition that a settlement does not serve the public interest—and therefore should be rejected—if it "does not involve any admissions" by the defendant. However, the Second Circuit recently clarified that an admission of liability is not a prerequisite for judicial approval of an agency settlement. Specifically, in staying the district court proceedings in *Citigroup,* the Court of Appeals "question[ed] the district court's apparent view that the public interest is disserved by an agency settlement that does not require the defendant's admission of liability." *Citigroup,* 673 F.3d at 165. Accordingly, AARP's demand for an admission of liability is without merit.

IV. *Disgorgement of Proceeds to the U.S. Treasury*

■ AARP argues further that the disgorged funds should be used to compensate New York City electricity consumers, rather than be remitted to the U.S. Treasury. But remittance of the disgorged funds to the U.S. Treasury is appropriate for three reasons. First, reimbursement to ratepayers could violate the Miscellaneous Receipts Act, 31 U.S.C. § 3302(b), which obligates Government officials "receiving money for the Government from any source [to] deposit the money in the Treasury[.]" This requirement is vitally important, as it "derives from and safeguards a principle fundamental to our constitutional structure, the separation-of-powers precept embedded in the Appropriations Clause, that '[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law,' U.S. Const. art. I, § 9, cl. 7." *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.,* 87 F.3d 1356, 1361 (D.C.Cir.1996) (alteration in original). Second, reimbursing electricity consumers could circumvent the filed-rate doctrine, which bars suits "grounded on the allegation that the rates charged by the utility are unreasonable." *Keyspan,* 763 F.Supp.2d at 643 (quoting *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir.1994) (internal quotation marks omitted)); *see also Simon v. Keyspan Corp.,* 785 F.Supp.2d 120, 138–39 (S.D.N.Y.2011) (explaining that the filed-rate doctrine would preclude a private damages action involving the Morgan Stanley/KeySpan swap). Finally, unlike the proposal to compensate New York City electricity consumers, disgorgement to the U.S. Treasury "can be effectuated without incurring transaction costs," and it "inures to the public benefit." *Keyspan,* 763 F.Supp.2d at 643; *see also SEC v. Bear, Stearns & Co.,* 626 F.Supp.2d 402, 419 (S.D.N.Y.2009) (finding that disgorgement to the U.S. Treasury provides "the greatest good for the greatest number of people" (internal quotation marks omitted)). Accordingly, remitting the $4.8 million disgorgement amount to the U.S. Treasury serves the public interest.

*CONCLUSION*

For the foregoing reasons, the Government's motion for entry of the Consent

Decree is granted. The Clerk of the Court is directed to terminate all pending motions and mark this case closed.

SO ORDERED.